Adam S. Sieff*
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800
adamsieff@dwt.com

Abigail B. Everdell*
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 603-6468
abigaileverdell@dwt.com

David C. Reymann (UT Bar No. 8495)
Kade N. Olsen (UT Bar No. 17775)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
dreymann@parrbrown.com
kolsen@parrbrown.com

Ambika Kumar*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 622-3150
ambikakumar@dwt.com

David M. Gossett*
Celyra I. Myers*
Azeezat Adeleke*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 973-4200
davidgossett@dwt.com
celyramyers@dwt.com
azeezatadeleke@dwt.com

*Attorneys for Plaintiffs*
*Pro hac vice applications forthcoming*

# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| M.M., *by and through next friend* EMILY MCMASTER, N.G., *by and through next friend* ELISA PARDO, and J.S., *by and through next friend* ERIN SULLIVAN,<br><br>                              *Plaintiffs*,<br><br>v.<br><br>DEREK BROWN, *in his official capacity as Utah Attorney General*, and KATIE HASS, *in her official capacity as Director of the Utah Division of Consumer Protection*,<br><br>                              *Defendants*. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Civil Action No._____<br><br>Judge:<br><br>Magistrate Judge: |

## PRELIMINARY STATEMENT

1.      Utah has passed a law presumptively banning teenagers—and restricting everyone else—from accessing vast online libraries of fully protected speech. Sweeping even more broadly than the State's other recent attempts to childproof the internet, the Utah App Store Accountability Act, Utah Code § 13-76-101 *et seq.* (Ex. 1) (the "Act"), requires anyone in Utah to prove their age before downloading any mobile application content—from the ESPN and Wall Street Journal apps, to Coursera, Spotify, Audible, Kindle, and Wikipedia. Minors are banned from downloading any app—as well as paid content within any app—without parental consent. Parents must verify their identity and authority to provide such consent. And even willing parents who judge their teenagers responsible enough to choose apps, categories of apps, or paid content within apps for themselves must still provide individual consent for every download—blanket consent is not an option.

2.      The Act violates the First Amendment on its face for the same reasons a federal court enjoined a substantively identical Texas law in *Students Engaged in Advancing Texas v. Paxton*, --- F. Supp. 3d ----, 2025 WL 3731733 (W.D. Tex. Dec. 23, 2025) ("*SEAT II*") and *Computer & Communications Industry Association v. Paxton*, --- F. Supp. 3d ----, 2025 WL 3754045 (W.D. Tex. Dec. 23, 2025) ("*CCIA II*"). Defying the Supreme Court's insistence that governments have no "free-floating power to restrict the ideas to which children may be exposed," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794–95 (2011), the Act imposes content-based prior restraints on speech that replace parents' freedom to moderate their children's access to sources for learning, communication, and creativity with "what the State thinks parents *ought* to want." *Id.* at 804. It thus violates the rules that speech "neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," and that the government has no "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 & 795

1

n.3 (citation & quotation marks omitted).

3.      Just as the government could not compel a bookstore to screen patrons and stop minors from purchasing any book without parental approval, the State cannot ban minors from downloading digital content though app stores or within apps without parental consent. The Act is thus unlike the statute upheld in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025), as the Act targets and restricts access to "fully protected" materials, not just adult content that is unprotected as to minors. *Id.* at 482–85, 490–93 & n.12. Strict scrutiny applies, and the State fails that standard—especially given the less-restrictive voluntary parental controls available and the existing, more-targeted laws that Utah could instead enforce.

4.      Plaintiffs are Utah teens whom the Act will restrict from communicating, accessing information, and engaging in protected expression. They bring this action to vindicate their First Amendment rights by obtaining an order invalidating and enjoining the Act's challenged provisions.

## PARTIES

5.      Plaintiff M.M., a minor resident of Utah and high-school sophomore, is an avid guitar player and hobby photographer who publishes her music and photographs on apps like Instagram, TikTok, and photo-editing and sharing platform VSCO. M.M. uses her iPhone to download news and music—including from The New York Times, Spotify, and Instagram—so she can keep abreast of current events, receive breaking news alerts, view and share political and current events content, and listen to news-oriented podcasts. She regularly rents films and series through Amazon Prime, and buys audiobooks on Audible. M.M. also uses apps like Ultimate Guitar and Guitar Tuna to tune her instrument and learn new chords, and apps like Pinterest and Ravelry to access knitting tutorials and learn new knitting patterns. M.M. brings this lawsuit through her mother, Emily McMaster.

6.    Plaintiff N.G., a minor resident of Utah and high school sophomore, is a dedicated, nationally ranked travel tennis player. N.G. uses his iPhone to stay in touch with fellow tennis players across the country, learn about new techniques and tennis intensives, and hear about his peers' political opinions through apps like Instagram and Snapchat. As he prepares for college recruitment season, N.G. uses apps like MatchTennis and the Universal Tennis Rating app to keep up with and display his stats, connect with other players to set up practice matches, and will eventually use these apps to communicate with collegiate tennis coaches and recruiters. In addition to tennis, N.G. is passionate about his mental health and wellness, and uses app-based tools like WakingUp to guide him through daily meditations. He brings this lawsuit through his mother, Elisa Pardo.

7.    Plaintiff J.S., a minor resident of Utah and a high school sophomore, is a member of her school's soccer team who uses apps like Instagram, YouTube, and Veo to share highlight reels and showcase her talent to attract college recruiters. J.S. uses apps like Instagram and Pinterest to inspire her cooking and drawing hobbies, and uses TikTok to explore new workouts to incorporate into her training. She uses her iPhone to access apps like the New York Times app to receive breaking news alerts, Ollie to keep in touch with her soccer coaches and teammates, and InnerView to track her progress as she works toward meeting her school's community service requirement. J.S. also uses apps like WhatsApp to communicate with her family in other states, and Snapchat to stay connected to her friends and peers. She brings this lawsuit through her mother, Erin Sullivan.

8.    Defendant Derek Brown, the Utah Attorney General, is sued in his official capacity. He is entitled to be heard in any action challenging the Act as unconstitutional. *See* Utah Code § 78B-6-403(3).

9. Defendant Katie Hass, Director of the Utah Division of Consumer Protection, is charged with enforcing the Act, Utah Code §§ 13-76-301, 13-2-5(3), (6), and is sued in her official capacity.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over this action under 28 U.S.C §§ 1331 and 1343(a) because Plaintiffs' claims arise under the United States Constitution and the Civil Rights Act, 42 U.S.C. §§ 1983, 1988.

11. This Court has authority to grant injunctive relief under 28 U.S.C. § 1651 *and Ex parte Young*, 209 U.S. 123 (1908). The Act delegates authority to Defendants Brown and Hass to enforce and to give effect to the Act by classifying violations of Utah Code § 13-76-201(2)(b) and § 13-76-202(4)(b) as "deceptive trade practice[s]," *id.* § 13-76-401(1), and by providing that Defendant Hass "shall make rules establishing processes and means by which an app store provider may verify whether an account holder is a minor," *id.* § 13-76-301, obligating Defendant Hass to give effect to the Act's requirements. *See also id.* § 13-11a-4(1)(a). The Act also grants Defendant Hass power to enforce "violation[s] of the division rules and the laws administered and enforced by it," *id.* § 13-2-5(3), providing Defendant Hass with the authority to enforce the Act.

12. This Court also has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this dispute and award relief because the litigation presents an actual case or controversy within the Court's jurisdiction for the same reasons.

13. Venue is proper in this District because Defendants reside in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to Plaintiffs' claims occurred in this District, 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

14. The Act restricts Utahns' access to vast quantities of information and important fora

for human communication. The burdens on speech are significant and impermissible.

### A. App stores are libraries for digital content.

15. App stores allow anyone with a smartphone and an internet connection to access the accumulated sum of virtually all recorded human knowledge.[1] On Apple's iOS App Store alone, more than 1 billion people have access to millions of apps, published by more than 30 million developers. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023). Other major app stores in the United States include the Google Play Store for Android OS devices, the Amazon Appstore for Fire Tablets and Fire TV systems, the Galaxy Store for Samsung devices, and the Microsoft Store for Surface devices. Most Americans, and nearly all teenagers, use app stores to access, engage with, and contribute to the information and expression disseminated online.[2] Mobile applications are thus by many measures the dominant fora in which humankind— and especially young people—speak, communicate, and express themselves.

16. App stores deliver and facilitate speech in every imaginable way, serving as the gateway to the applications through which users access the internet. Some of those applications, such as Wikipedia, search apps, and internet browsers, are tools to search and discover all the information that exists online. Others, such as WhatsApp and Slack, provide messaging services

---

[1] Nicole Shekhovtsova & Marc Scribner, *The App Store Accountability Act would undermine privacy and parental choice*, REASON FOUND. (MAY 7, 2025), https://reason.org/backgrounder/the-app-store-accountability-act-would-undermine-privacy-and-parental-choice [https://perma.cc/9UHL-XVU2].

[2] *See Sensor Tower: Consumer Spending on Apps Soared in 2024 and Mobile Rode the Wave of AI Enthusiasm*, PR NEWSWIRE (Jan. 22, 2025), https://www.prnewswire.com/news-releases/sensor-tower-consumer-spending-on-apps-soared-in-2024-and-mobile-rode-the-wave-of-ai-enthusiasm-302356483.html [https://perma.cc/H6W6-8E8N]; *Teens and Internet, Device Access Fact Sheet*, PEW RSCH. CTR. (July 10, 2025), https://www.pewresearch.org/internet/fact-sheet/teens-and-internet-device-access-fact-sheet [https://perma.cc/CKF6-3EAY]; Laura Ceci, *Mobile app usage of children in the United States—statistics & facts*, STATISTA (Nov. 22, 2024), https://www.statista.com/topics/10106/mobile-app-usage-of-children-in-the-united-states/#topicOverview [https://perma.cc/7APU-DQ3G].

for direct communication. Audible, Kindle, Netflix, Spotify, YouTube, and similar apps contain libraries of copyrighted music, movies, television shows, books, audiobooks, and podcasts. Coursera, Codecademy, and Duolingo provide access to educational programming. Media organizations like the Salt Lake Tribune, the New York Times, the Wall Street Journal, ESPN, Sports Illustrated, and the Atlantic offer apps that distribute reporting, essays, and videos. Some apps, like Substack, Medium, SoundCloud, and CapCut, function as publishing studios to create and share writing, music, videos, and other expressive content. Gaming applications like Minecraft and Terraria publish creative interactive worlds for exploration and entertainment. And of course, social media apps like X, Facebook, Instagram, TikTok, Reddit, and Snapchat provide fora for sharing digital media. In short, the information distributed through apps is "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 852 (1997) (cleaned up).

> **B.      Plaintiffs use app-store distributed applications for expression, communication, education, and advocacy.**

17.     Plaintiffs use a variety of applications that they download from app stores as a regular part of their daily life. These applications include but are not limited to the following:

18.     ***Messaging apps***. Numerous apps allow students to communicate with each other and with trusted adults. Schools, for example, use certain apps for communication among students and teachers. M.M. uses the GroupMe app to communicate with her golf and tennis teams to discuss practice schedules and upcoming meets, as well as her colleagues at her after-school job at her family's pizzeria to discuss shift scheduling. J.S. uses the app Ollie to connect with her coaches, teammates, and their parents to stay in the loop regarding important team events and information. N.G., a member of the United States' tennis delegation to the Maccabi Games in Israel, uses WhatsApp to communicate with his team and coaches.

19.     ***Content library apps.*** Certain apps function as libraries for books, music, and video

content that allow both teens and adults to access and enjoy a wide range of expressive and informational material. Spotify, for example, hosts music and podcasts. Audible offers audiobooks and podcasts. And Libby allows users to "borrow" e-books from public libraries. Video-content libraries, such as YouTube and Prime Video, are especially popular with teens. YouTube in particular is "the most widely used platform," used by around 90 percent of teens,[3] and has a "staggering" volume and variety of video content.[4] M.M. purchases audiobooks like *The Great Gatsby* and *Mona's Eyes* using Audible for both school assignments and her own enjoyment. She also uses TikTok and YouTube to find video tutorials for her creative activities and subjects she is studying at school. N.G. rents films like "The Shawshank Redemption" on Prime Video, and uses YouTube to find guided stretching and plyometric exercise videos.

20.    As a result of their ubiquity and variety, video library apps in particular are a popular forum for learning about new topics—more so than traditional books or websites. YouTube, for example, operates a channel called YouTube Teachers, where teachers can share lessons.[5] Teachers "Rob and Jeremy" (@mathantics) share lessons on algebra and geometry with their 3.74 million YouTube subscribers. Science teacher and author Dave Farina (@ProfessorDaveExplains) posts study guides and lessons in high school physics and biology to his 4.18 million YouTube subscribers. And Phillip Cook (@chemteacherphil) shares chemistry lessons with his 1.42 million YouTube subscribers.

---

[3] Monica Anderson et al., *Teens, Social Media and Technology 2023*, PEW RSCH. CTR. (DEC. 11, 2023), https://www.pewresearch.org/internet/2023/12/11/teens-social-media-and-technology-2023 [https://perma.cc/8QPC-ZKYV].

[4] Patrick Van Kessel et al., *A Week in the Life of Popular Youtube Channels*, PEW RSCH. CTR. (JULY 25, 2019), https://www.pewresearch.org/internet/2019/07/25/a-week-in-the-life-of-popular-youtube-channels [https://perma.cc/X6FK-67QD].

[5] YouTube Teachers, https://www.youtube.com/teachers [https://perma.cc/M7UG-9WM4] (last visited Feb. 9, 2026).

21.     M.M. has not only voluntarily used general-purpose apps like Instagram, TikTok, and YouTube to view explanatory or tutorial-style videos to help further explain school subjects like algebra and geometry, but is required to view educational videos published by CrashCourse (@CrashCourse) on YouTube as part of her Advanced Placement Psychology class. M.M. also uses apps like Spotify to listen to news, educational, and quiz-style podcasts, including "The Daily," "How I Built This," and "Wait Wait … Don't Tell Me." N.G. uses the Spotify app to listen to new music from artists like Drake and Ed Sheeran, and J.S. uses TikTok to find workout tutorials.

22.     ***Educational apps.*** In addition to all-purpose online content apps, many mobile apps are developed specifically for educational purposes. Apps like Chegg, Quizlet, and Course Hero provide students with on-demand tutoring, study guides, tutorials, and course reviews for subjects like English, social studies, foreign languages, and STEM disciplines.

23.     M.M. uses mobile apps for educational purposes, including Quizlet, which she uses to create flashcards to help her study for exams, and ChatGPT, which she uses to summarize and explain class materials with permission from her teachers; N.G. uses Canvas and Powerschool, which are digital blackboard apps that help keep track of grades and school assignments; and J.S. uses AI-powered Thea: Study Smart to generate study guides, quizzes, and flashcards based on her class materials and notes.

24.     ***News apps.*** Mobile apps have become a major distribution method for both traditional and non-traditional news platforms. Of the 105 most-visited news outlets in 2023, around three quarters had dedicated mobile apps, and at least 92 percent were available through

8

news-aggregator apps like Flipboard.[6] Teenagers use these apps. M.M. and J.S., for example, use the New York Times app, which allows them to receive breaking news alerts and read about current events.

25.     ***Content creation apps.*** In addition to apps allowing users to view and engage with content, apps like CapCut and Canva—as well as apps like TikTok, YouTube, Pinterest, and Instagram—allow users to create content. M.M., for example, uses the video-editing app CapCut to edit videos she shares on TikTok. M.M. also uses the app VSCO to edit her photos for personal use and for inclusion in her curated photo collections on the VSCO platform. J.S. uses the Veo app to watch gameplay footage and select clips for her highlight reels.

26.     ***Social media apps.*** Social networks provide platforms for communication, expression, education, and association. Approximately 90 percent of teenagers between ages 13 and 17 have at least one social network account.[7] More than half of teens use TikTok, Snapchat, and Instagram.[8] All of these platforms were created as mobile apps and are designed primarily for mobile app usage.[9] M.M. uses the social media apps Instagram, Snapchat, TikTok, and Pinterest. M.M. uses Instagram and Snapchat to connect with peers, receive news and information about

---

[6] *Digital News Fact Sheet*, PEW RSCH. CTR. (Nov. 10, 2023),. https://www.pewresearch.org/journalism/fact-sheet/digital-news/ [https://perma.cc/9JHU-6FU9].

[7] Susan Laborde, *Teenage Social Media Usage Statistics in 2023*, TECHREPORT (updated May 30, 2024), https://web.archive.org/web/20231017013802/https://techreport.com/statistics/teenage-use-of-social-media-statistics/.

[8] *See* Anderson, *supra* n.3.

[9] Rebecca Fannin, *The Strategy Behind Tiktok's Global Rise*, HARV. BUS. REV. (SEPT. 13, 2019), https://hbr.org/2019/09/the-strategy-behind-tiktoks-global-rise [https://perma.cc/K7JA-XYR9]; Keving Systrom, *Introducing Your Instagram Feed on Desktop*, INSTAGRAM (FEB. 5, 2013), [https://perma.cc/2XNW-LMBF]; Jonathan Vanian, *Snapchat is finally coming to the web after more than a decade as a mobile app*, CNBC (JULY 18, 2022), https://www.cnbc.com/2022/07/18/snapchat-is-coming-to-the-web-after-more-than-a-decade-as-a-mobile-app.html [https://perma.cc/JU62-T7LA].

opportunities for civic participation, and to follow recording artists like Noah Kahan, Taylor Swift, and Japanese Breakfast for inspiration and up-to-date information on new music and performances. On TikTok, M.M. shares her own music content to her friends on a private account. J.S. uses apps like Instagram to follow celebrity chefs she admires, women's collegiate soccer teams she is interested in, and share photos from her travels and her opinions on current events with her peers. J.S. also uses Instagram to showcase her soccer highlights for other players and college recruiters. N.G. uses apps like Snapchat to stay connected to his college-age brothers, long-distance friends, and fellow tennis players across the country.

27.    Social networking apps are integral to modern life, for both teens and adults. Among other things, social networks provide an essential outlet for political expression. Youth-led movements have used social media to bring attention to issues not adequately covered in traditional media. Students at Marjory Stoneman Douglas High School in Parkland, Florida, have used social networks to advocate for gun violence prevention after a school shooting there killed seventeen people.[10] Middle- and high-school students have used social media to create a national network of "Sunrise Movement" chapters to combat climate change.[11] And the libertarian non-profit BASEDPolitics uses social media to "introduce young people 'to the ideas of free market capitalism and individual liberty.'"[12] Plaintiff M.M. has learned about her peers' political views

---

[10] Jonah E. Bromwich, *How the Parkland Students Got So Good at Social Media*, N.Y. TIMES (Mar. 7, 2018), https://www.nytimes.com/2018/03/07/us/parkland-students-social-media.html [https://perma.cc/H42Y-TDEK].

[11] Emma Weber, *How Young People Make Change*, THE PROGRESSIVE MAG. (Apr. 22, 2025), https://progressive.org/magazine/how-young-people-make-change-weber-20250422 [https://perma.cc/24Y6-YJGY].

[12] Elizabeth Nolan Brown, *'If They Can Control the Flow of Information They Can Control You': BASEDPolitics Sues To Stop TikTok Ban*, REASON (JUNE 10, 2024), https://reason.com/2024/06/10/if-they-can-control-the-flow-of-information-they-can-control-you-basedpolitics-sues-to-stop-tiktok-ban [https://perma.cc/9LME-YVZD] (last visited Oct. 1, 2025).

and information about political protests in her city through social media apps like Instagram, Snapchat, and TikTok. In January, M.M. attended a political march against ICE's activities in Minnesota, which she learned about on Instagram. And Plaintiff N.G. engaged with the controversy surrounding Bad Bunny's Super Bowl halftime performance through posts and stories on Instagram.

28.    Politicians and lawmakers similarly use social networks to communicate with voters (including teenage voters), as well as teens approaching voting age.[13] Social media is "near ubiquitous among members of Congress."[14]

29.    Social networks are a principal source of news for most Americans.[15] More than half of teens access news using social networks at least a few times per week, including on Instagram, Facebook, and X.[16] M.M. uses social media to obtain news about politics through accounts like @SaintHoax and @Mattxiv on Instagram. Just this year, for example, she found out

---

[13] Laura Barron-Lopez et al., *How social media influencers are playing a role in the presidential election*, PBS NEWS (Mar. 19, 2024), https://www.pbs.org/newshour/show/how-social-media-influencers-are-playing-a-role-in-the-presidential-election.

[14] Patrick Van Kessel et al., *The congressional social media landscape*, PEW RSCH. CTR. (July 16, 2020), https://www.pewresearch.org/internet/2020/07/16/1-the-congressional-social-media-landscape [https://perma.cc/YS6K-UGFE]. In 2021 alone, congressional representatives published more than 477,000 Twitter (now "X") and nearly 300,000 Facebook posts. Stacy Jo Dixon, *Total number of posts per platform by U.S. Congress members 2021*, STATISTA (July 11, 2025), https://www.statista.com/statistics/958814/total-number-posts-per-platform-congress-members-usa [https://perma.cc/BVB5-GEQV].

[15] Jeffrey Gottfried & Elisa Shearer, *News Use Across Social Media Platforms 2016*, PEW RSCH. CTR. (May 26, 2016), https://www.pewresearch.org/journalism/2016/05/26/news-use-across-social-media-platforms-2016 [https://perma.cc/R39S-2FU6].

[16] Common Sense Media, *New Survey Reveals Teens Get Their News From Social Media and YouTube* (Aug. 12, 2019), https://www.commonsensemedia.org/press-releases/new-survey-reveals-teens-get-their-news-from-social-media-and-youtube [https://perma.cc/G3JD-5SPB]; *see also* Michael Boulter & Lizz Bolaji, *In the age of memes, how are young people getting their news?*, PBS NEWS (Jan. 23, 2020), https://www.pbs.org/newshour/nation/in-the-age-of-memes-how-are-young-people-getting-their-news [https://perma.cc/J9G6-DAVA].

about the recently introduced Utah H.B. 183, and its impacts on transgender Utahns, through an Instagram post. M.M. also follows her school's official Instagram account to keep abreast of important information regarding school events, which she would otherwise not know about. Just last year, N.G. learned of Charlie Kirk's assassination through his friends' social media reposts of news stories about the murder.

30.    Social media is also an "important venue for interaction and conversation among" American teenagers and "plays a critical role in connecting teens to new friends" by "allowing teens to learn more about new friends and get to know them better."[17] M.M., N.G, and J.S., for example, regularly use social media to connect with new and old friends alike. One recent study found teenagers who use social networks reported that they feel more connected to their friends (80 percent); had somewhere to express their creativity (71 percent); had a support network in challenging times (67 percent); and were more accepted (58 percent).[18] Overall, U.S. teenagers are more likely to report that social networks have positive rather than negative effects on their lives.[19] In fact, research suggests that the isolation that results from disconnecting teens from social networks may be more harmful to their self-esteem and well-being than is heavy use of the medium.[20]

---

[17] Amanda Lenhart, *Chapter 4: Social Media and Friendships*, PEW RSCH. CTR. (Aug. 6, 2015), https://www.pewresearch.org/internet/2015/08/06/chapter-4-social-media-and-friendships [https://perma.cc/DF3Y-PPG2].

[18] Emily A. Vogels & Risa Gelles-Watnick, *Teens and social media: Key findings from Pew Research Center surveys*, PEW RSCH. CTR. (Apr. 24, 2023), https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys [https://perma.cc/DF3Y-PPG2].

[19] *Id*.

[20] Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41:2 SOC. SCI. COMP. REV. 626 (Aug. 5, 2022); *see also* Sarah Coyne et al., *Teaching By Example: Media and Parenting Practices that are—and are not—Related to*

31.     Finally, discussion- or "Q&A"-based social networking apps—such as Reddit, Quora, and Goodreads: Book Reviews—provide content about topics ranging from "How-To" videos for home improvement projects to personal finance tips to book reviews.[21] Reddit subgroups for craft projects, yoga, meditation, baking, and running each have more than 1.8 million members,[22] and groups for gardening and woodworking each have more than five million members.[23]

32.     The role of social networks in fostering community and connection—what some researchers have called the development of one's social, religious, cultural, ethnic, sexual, and political identities—is one of their most profound contributions.

### C.     Utah enacts the App Store Accountability Act.

33.     On March 26, 2025, Utah Governor Spencer Cox signed the Act into law. Its requirements take effect on May 6, 2026. Utah Code §§ 13-76-201, 13-76-202.

34.     The Act restricts and burdens speech in a variety of ways. Broadly, the Act creates age-verification and parental-consent mandates, under which minors may not download apps or paid purchases within apps without parental consent. The Act regulates both app stores and the app developers whose apps appear in those stores. It additionally requires app stores to display to

---

*Adolescent Mental Health*, WHEATLEY INST. (2022), https://wheatley.byu.edu/00000182-8d78-dff6-afab-8ffd11ce0001/teaching-by-example-pdf.

[21] Reddit, r/DIY, https://www.reddit.com/r/DIY/ (last visited Feb. 10, 2026) (DIY Reddit has 27.3M members); Reddit, r/personalfinance, https://www.reddit.com/r/personalfinance/ (last visited Feb. 10, 2026) (Personal Finance Reddit has 2.5M weekly visitors).

[22] Reddit, r/crafts, https://www.reddit.com/r/crafts/ (last visited Feb. 10, 2026); Reddit, r/yoga, https://www.reddit.com/r/yoga/ (last visited Feb. 10, 2026); Reddit, r/Meditation, https://www.reddit.com/r/Meditation/ (last visited Feb. 10, 2026); Reddit, r/Baking, https://www.reddit.com/r/Baking/ (last visited Feb. 10, 2026); Reddit, r/running, https://www.reddit.com/r/running/ (last visited Feb. 10, 2026).

[23] Reddit, r/gardening, https://www.reddit.com/r/gardening/ (last visited Feb. 10, 2026); Reddit, r/woodworking, https://www.reddit.com/r/woodworking/ (last visited Feb. 10, 2026).

parents age ratings and content descriptions for apps and in-app purchases, if available.

35.    ***Scope and exemptions***. The Act governs providers of "app stores" in Utah—defined as any "publicly available website, software application, or electronic service that allows users to download apps from third-party developers onto a mobile device," such as a smartphone or tablet. *Id.* § 13-76-101(5)-(6). It further regulates "developer[s]," who own or control apps made available through app stores in the state. *Id.* § 13-76-101(8).

36.    The Act applies only to app downloads—and paid purchases within apps—on mobile devices, not pre-installed native apps, software available through web browsers, or apps available on non-mobile devices such as internet-connected televisions. This leads to inconsistent regulation of the same apps, services, or content on different devices, as well as of the same types of apps on any given device.

37.    *First*, certain apps that are covered by the Act on some devices are outside the scope of the Act on other devices, depending on how those apps are distributed. The Apple Music app, for example, comes pre-installed on Apple iPhones but must be downloaded to Android phones and Samsung TVs. Of these uses, the app is subject to the parental-consent requirement only when downloaded from an app store on an Android phone. And because any given person may own multiple devices, a different set of restrictions might apply to the same person on different devices—her Apple iPhone, Samsung Galaxy, Microsoft Surface, and Amazon Fire tablet, for example.

38.    *Second*, materially identical apps are regulated differently for the same person on the same device. For example, because the iMessage messaging app is preinstalled on iPhones but the Signal messaging app must be downloaded on iPhones, only the latter will be subject to the parental-consent requirement on an iPhone. Similarly, because Android phones come pre-installed

14

with Google Chrome but not Firefox, parental consent is only required for Firefox.

39. *Third*, the requirement for parental consent before a minor "make[s] an in-app purchase," Utah Code § 13-76-201, will apply differently to the same content across users. A minor who has the Disney+ app and a Disney subscription will not need parental consent to download *Finding Nemo*, yet another will require it to rent the movie in the Apple TV app—and neither will need consent to purchase the DVD at Best Buy.

40. The Act exempts apps that: (1) provide users with "direct access to emergency services," (2) "limit[] data collection to information necessary to provide emergency services in compliance with" the Children's Online Privacy Protection Act, 15 U.S.C. § 6501 *et seq*., (3) "provide access without requiring account creation or collection of unnecessary personal information," and (4) are "operated by or in partnership with a government entity, a nonprofit organization, or an authorized emergency service provider." Utah Code § 13-76-404(4). This provision results in significant and arbitrary carve-outs. For example, it would exempt emergency or crisis hotline apps that do not require account creation or ask for "unnecessary personal information" (whatever that means), but ban apps that collect limited data to connect users to the help they are seeking. Thus, a Utah teen would be able to download the American Red Cross's Emergency App without parental permission, because it does not require account creation, but the same teen would be barred from downloading 7 Cups, a mental health app that requires account creation and limited personal information to access counseling services and a 24/7 hotline.[24]

41. ***Age-verification and parent-identification mandates.*** Before anyone in Utah may

---

[24] 7 Cups: Online Therapy and Chat, https://apps.apple.com/us/app/7-cups-online-therapy-chat/id921814681 [https://perma.cc/MBS3-6KCW] (last accessed Feb. 10, 2026) (app offering "24/7 emotional support through 1-on-1 text, chats, and video with trained listener hotlines" and "counseling services with licensed professionals").

create an account to access an app store, the app store must "request age information from the individual" and "verify the individual's age category" using either "commercially available methods that are reasonably designed to ensure accuracy" or "an age verification method or process" that complies with unspecified rules to be developed by the Utah Division of Consumer Protection. Utah Code §13-76-201(1). The age categories are: (i) child (younger than 13); (ii) younger teenager (13-15); (iii) older teenager (16-17); and (iv) adult (18 and older). *Id.* § 13-76-101(1). When a developer is implementing any safety-related features or defaults that it has developed, it is required to "use the lowest age category indicated by" either "age verification data provided by an app store provider" or "age data independently collected by the developer." *Id.* § 13-76-202(3).

42.     An app store may not permit anyone under 18 to download apps until the minor "affiliate[s] with a parent account" and the app store "obtain[s] verifiable parental consent" from the parent or guardian holder of that parent account. *Id*. § 13-76-201(1)(b). *See also id*. § 13-76-101(15), (16), (19). Thus, any individual identified as a minor must identify his or her parent or guardian, and app store owners must then employ age and identity verification tools to confirm that the prospective "parent account" in fact belongs to an adult parent or guardian of the minor. *See id*; *id.* § 13-76-101(16), (19).

43.     ***Parental-consent mandate.*** Even if a minor affiliates with a parent or guardian, that does not mean the minor may download apps as the minor or her parents wish. Instead, *each time* a minor wishes to download an app from an app store—or purchase content within an app the minor has already downloaded with her parent's consent—that minor must "obtain verifiable parental consent." *Id*. § 13-76-201(1)(b)(ii). Consent requires app stores to provide the parent with any age rating or content description information available for the app or in-app purchase. *Id.* § 13-

76-101(17).

44.    Minors who cannot obtain consent may not access the content. *Id*. App stores must also share a user's age and parental-consent information with app developers, *id.* § 13-76-201(d), who are also required to ensure that minors lacking qualifying consent do not access their content. *Id.* § 13-76-202(1).

45.    The Act does not permit parents to authorize multiple downloads or purchases. Instead, they must grant separate consent for each and every individual download or purchase sought by their child. *See id.* § 13-76-201(1)(b).

46.    Even when a parent grants consent, an app store must revoke it whenever there is a "significant change" affecting the type of data the app collects, stores, or shares; its age rating or content descriptions; or its available monetization features. *Id.* §§ 13-76-101(18); 13-76-201(1)(c). The app store must also revoke consent where there are "material[] changes" to the app's "functionality" or "user experience." *Id*.

47.    *Enforcement.* The Act provides that a minor or their parent may bring a civil suit against an app store provider or developer for alleged violations of the Act's age verification and parental consent requirements. *Id.* § 13-76-401(2). Courts may award actual damages or $1,000 per violation, whichever is greater. *Id.* § 13-76-401(3). The Act further provides that any app store provider or developer which "knowingly misrepresent[s] information in the parental consent disclosure" has engaged in "a deceptive trade practice" under Utah law. *Id.* §§ 13-76-201(2)(b); 13-76-202(4)(b); 13-76-401(1) (citing *id.* § 13-11a-3).[25] Under existing law, either the state of

---

[25] Section 13-76-401(1) states, "A violation of Subsection 13-75-201(2)(b) or Subsection 13-75-202(4)(b) constitutes a deceptive trade practice under Section 13-11a-3." The two statutory citations here appear to be in error. Plaintiffs assume that the statute means to refer to Subsection 13-**76**-201(2)(b) and Subsection 13-**76**-202(4)(b), both of which state that the app store provider

Utah or a minor and her parents can bring a civil action on the basis of an alleged deceptive trade practice. *See id.* § 13-11a-4(1)(b). Remedies include injunctive relief and money damages, with the latter being the greater of actual damages or $2,000. *Id.* § 13-11a-4(1)(b). Given the millions of app-store and app users in Utah, penalties under the Act could prove extraordinary.

### D.    The Act severely burdens and prevents speech.

48.    The Act creates significant and unjustifiable burdens on all Utahns' ability to share and receive information and expression.

49.    ***The age-verification and parent-identification mandates create barriers to speech.*** The Act's age-verification mandate—which applies to all Utahns, including adults—is by itself an invasive and significant barrier to speech. Age and identity-verification technologies force disclosure of sensitive personal information, such as government-issued IDs, credit card information, or biometric data.[26] Many people would prefer not to disclose that information, and some may lack identity-verifying documents altogether.[27] When imposed, as here, as a precondition to engage in speech, the effects are to prevent speech before it can occur, and to raise the cost of engaging in any speech.[28]

50.    These burdens are compounded for minors because the Act also requires their

---

or developer "may not … knowingly misrepresent any information in the parental consent disclosure."

[26] Eric Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 STAN. TECH. L. REV. 173, 205 n.129, 202–08 (2025).

[27] Jillian A. Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2, Univ. Md. Ctr. for Democracy & Civic Engagement (June 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%2 0Results%20Jan%202024%20%281%29.pdf    [https://perma.cc/57M7-57EC];    Shoshana Weissmann, *Kids Don't Have IDs And Age-Estimation Tech Is Frequently Very Wrong*, TECH DIRT    (May    23,    2025),    https://www.techdirt.com/2025/05/23/kids-dont-have-ids-and-age-estimation-tech-is-frequently-very-wrong [https://perma.cc/2HJF-XB4J].

[28] *See* Goldman, *supra* note 26 at 216.

accounts to be "affiliated" with a parent account—which requires their parent or guardian to submit unspecified yet inevitably sensitive documentation (like a birth certificate or adoption record) verifying their legal parental authority. This double-layered verification regime means a teenager's ability to access (or publish) content in an app store's content library is not only limited by their own willingness and ability to submit documents sufficient to verify their age, but also by their parents' willingness and ability to do so. And access is further limited by the parental-consent mandate, which requires verifiable parental consent before minors may obtain any apps or downloadable material within an app in each instance, even if a parent would want to provide blanket consent as to certain categories of material. This reflects the Act's focus on burdening access to speech the State deems unsuitable, rather than on empowering parents. Further, the Act offers no guidance for minors who may face common obstacles to obtaining parental verification or consent, like having a parent with a different last name or different address, having parents who have conflicting views on what media they should be permitted to consume, or being an emancipated minor.

51.    The effect in many, if not most, cases will approximate a ban. Americans—including Plaintiffs N.G., J.S., M.M. and her mother, Emily—are skeptical about the security and reliability of age-verification. Sixty-six percent of Americans say they "are not comfortable sharing their identification documents or biometric information with online platforms," and 70 percent say they are "uncomfortable with their children using such methods." *Free Speech Coal., Inc. v. Rokita*, 738 F. Supp. 3d 1041, 1049 (S.D. Ind. 2024) (citing evidence) (cleaned up), *vacated on other grounds*, 2025 WL 2027434 (7th Cir. July 15, 2025). Their reluctance is understandable. Available age-verification and parent-identification methods bear the risk that sensitive personal

information and documents could be stolen or leaked.[29] Other nascent age-verification methods—such as artificial intelligence, facial analysis, or facial recognition—pose their own transparency, security, and privacy concerns.[30] Indeed, a recent data breach of an app that required identity verification through photos or IDs resulted in a trove of user photos and identification cards being leaked online, with the hackers reportedly creating a map to tie users to their locations.[31] Another recent breach of an age-verification vendor resulted in the leak of 70,000 Discord users' identification photos.[32] And numerous other age-authentication companies have suffered data breaches.[33] And in evaluating a California law imposing a similar age-verification mandate, the California Privacy Protection Agency confirmed that "there is currently no privacy-protective way to determine whether a consumer is a child."[34] Users who do not wish to expose themselves to the privacy risks associated with age verification—or whose parents, if they are minors, refuse to do so—will be shut out of app stores altogether.[35]

52.    The age-verification, parent-identification, and parental-consent mandates will

---

[29] Jackie Snow, *Why Age Verification Is So Difficult for Websites*, WALL ST. J. (Feb. 27, 2022), https://www.wsj.com/articles/why-age-verification-is-difficult-for-websites-11645829728.

[30] *See* David McCabe, *Anonymity No More? Age Checks Come to the Web*, N.Y. TIMES (Oct. 27, 2021), https://www.nytimes.com/2021/10/27/technology/internet-age-check-proof.html [https://perma.cc/R837-JAQB].

[31] Isabella Kwai et al., *What to Know About the Hack at Tea, an App Where Women Share Red Flags About Men*, N.Y. TIMES (July 26, 2025), https://www.nytimes.com/2025/07/26/us/tea-safety-dating-app-hack.html.

[32] Osmond Chia, *ID photos of 70,000 users may have been leaked, Discord says*, BBC (Oct. 9, 2025), https://www.bbc.com/news/articles/c8jmzd972leo [https://perma.cc/PB56-UUZA].

[33] Goldman, *supra* note 26 at 205 n.129.

[34] Memorandum from Maureen Mahoney, Deputy Dir. Pol'y & Legis., CAL. PRIV. PROT. AGENCY, to the Cal. Priv. Prot. Agency Bd. 5 (May 3, 2024), [https://perma.cc/AGT5-KNUY].

[35] Goldman, *supra* note 26 at 204, 206-208 (discussing the tendency of users to "bounce"—i.e. abandon attempts to gain access—when presented with an age verification "wall").

restrict Plaintiffs' ability to share and receive information and expressive content. The app stores that Plaintiffs use have warned that under the Act, they will be required to impose the Act's censorship on users like Plaintiffs.[36] The effects will be real and immediate.

53.    For example, M.M., who draws inspiration from the creative works of others, will have her own creative interests and processes stifled by the need to obtain parental consent for each learning app, photo editing app, guitar practice tool, or kitting guide she wants to download. This would also pose challenges to M.M.'s ability to access educational materials needed for schoolwork—including e-books, and documentaries—while her parents are at work or otherwise not able to immediately respond to consent requests.

54.    ***The parental-consent mandate creates further barriers to speech.*** Even after a minor convinces a parent to provide documentation sufficient to establish that parent's legal authority, the Act bans that minor from downloading any additional apps from app store libraries, or purchasing paid content within already-downloaded apps—no matter the app or content at issue—unless the minor obtains approval from that parent each and every time they wish to access a new app or new paid content within an app.

55.    But for these requirements, app stores would not impose these barriers to speech. As a result, the Act will cut off minors like Plaintiffs from speech and speaking unless and until they can obtain consent. Even if Utah parents would be willing to consent to their children accessing particular content, the process of finding a parent, requesting consent, and then making

---

[36] Testimony of NetChoice General Counsel Bartlett Cleland in Opposition to SB 142 (Feb. 19, 2025), https://netchoice.org/wp-content/uploads/2025/02/Utah-App-Store-Bill-Testimony.docx-Bartlett-Cleland.pdf [https://perma.cc/NK9F-A8PH]; Kerry Maeve Sheehan, *Utah's App Store Age Verification Bill Sets a Dangerous Precedent*, CHAMBER OF PROGRESS (Mar. 5, 2025), https://medium.com/chamber-of-progress/utahs-app-store-age-verification-bill-sets-a-dangerous-precedent-3f49058ea343.

that parent take the time to ratify the request impedes the free flow of information and, especially on the internet, creates delays that destroy speech.[37] *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury.") (emphasis added).

56.     The Act's requirement that consent be provided in each individual instance—further evidence that the Act's focus is restricting speech and not promoting parental control—amplifies this burden. It means that a minor must locate and harangue even a willing parent *each time* the minor discovers new material she wants to access—via a new app or a purchase in an existing app. That may not be possible for minors like M.M., for example, whose parents are both small business owners, or N.G., whose father is an anesthesiologist, who may not always be available to provide consent for each of their app store downloads during work hours. Other parents also may not, as a practical matter, be able to constantly monitor their devices—due to travel, lack of internet connectivity, illness, or otherwise.

57.     An analogous brick-and-mortar regime—requiring a teenager entering a bookstore, for example, to FaceTime her parent, have that parent produce a birth certificate or other document demonstrating legal authority, and then have the parent review and pre-approve the child's selection of titles to purchase at checkout—would strike the average American as a bizarre departure from our nation's traditions. Teenagers have long been free to hang around bookstores, newsstands, record stores, arcades, and multiplexes, spending their pocket cash on new releases, comic books, vinyl albums, Pac-Man, and double-features.[38]

---

[37] Br. of Prof. Eric Goldman as Amicus Curiae, *NetChoice, LLC v. Bonta*, No. 5:22-cv-08861-BLF, ECF No. 34-1 at 5-7 (N.D. Cal. filed Feb. 24, 2023).

[38] *See, e.g.*, Andrew O'Malley, *A Crisis of Innocence: Comic Books and Children's Culture 1940-1954* at § 3, Toronto Met. Univ. (Feb. 29, 2024), https://crisisofinnocence.library.torontomu.ca/exhibits/show/a-crisis-of-innocence/child-readers-of-comics    [https://perma.cc/XQ69-ARMQ]

58.    It is hard to imagine what could justify this censorship. Even if the State could demonstrate that minors need protection from *some* content on *some* apps (and it cannot), that does not justify effectively barring teenagers from *all* content on *all* apps. Nor can the Act be justified by a claim that it empowers parents. Many families will view the Act's top-down, one-size-fits-all granular oversight required by the parental-consent provision as *undermining* parental choices about how to balance levels of autonomy, privacy, and supervision—which may be different for every child. M.M.'s parents, for example, have made careful decisions to allow her increasing autonomy to make decisions relating to her digital activities as she has gotten older, in line with decisions they made with M.M.'s older sister. The Act would require M.M.'s parents to intrude on her privacy in a way they would not otherwise, effectively overriding their parental decision-making. And studies have found that requiring parents to oversee and consent to their children's online activity can negatively affect the parent-child relationship.[39]

## STANDING

59.    Speakers and listeners have standing to challenge government action that regulates the intermediaries they rely on to disseminate and access information when, but for the challenged government action, those intermediaries would continue to provide such access and use. *See Va. Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 & 757 n.15 (1976); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1119 (10th Cir. 2012); *Kan. Jud. Rev. v. Stout*, 519 F.3d 1107, 1111–15 (10th Cir. 2008); *ACLU v. Johnson*, 194 F.3d 1149, 1154–55 (10th Cir. 1999).

60.    Plaintiffs have standing because (i) enforcement of the Act against app stores and

---

(describing comic book culture as "a print phenomenon operating by and large outside of adult control" with principal places of purchase at newsstands and drugstores).

[39] Mariya Stoilova et al., *Do parental control tools fulfill family expectations for child protection? A rapid evidence review of the contexts and outcomes of use*, 18 J. CHILDREN & MEDIA 29 (Oct. 29, 2023), [https://perma.cc/AWV2-WXWK].

developers will restrict Plaintiffs' constitutional rights to disseminate and access information through apps; (ii) those concrete injuries are traceable to government action—not the app stores and developers themselves—because the app stores and developers would continue to afford Plaintiffs unrestricted access to and use of their services but for the Act, *see, e.g.*, Decl. of Matthew Bye, *CCIA v. Brown*, No. 2:26-cv-00094, ECF No. 16-3 at ¶¶ 3, 37-44 (D. Utah filed Feb. 5, 2026) and Decl. of Matthew Schruers, *CCIA v. Brown*, No. 2:26-cv-00094, ECF No. 16-2 at ¶¶ 8-12, 15-19, 22-26, 43-46, 50, 52-55 (D. Utah filed Feb. 5, 2026); and (iii) a favorable decision invalidating and enjoining enforcement of the Act would prevent the state action that causes Plaintiffs' injuries, thereby redressing those injuries. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Similarly situated students accordingly had standing to bring First Amendment claims against Texas's analogous app-store censorship legislation. *See SEAT II*, 2025 WL 3731733, at \*4.

61.    Plaintiffs have standing with respect to each portion of the Act Plaintiffs challenge and seek to enjoin. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

62.    With respect to the age-verification and parent-identification mandates, M.M., N.G, and J.S. use and intend to continue using app stores and apps to send and receive information, and will be subject to the Act's invasive age-verification requirements and its requirement that they link their accounts to the accounts of adults with legal parental authority. Plaintiffs will thus be restricted from and burdened in accessing fully protected speech disseminated through app stores, and unable to share information with or receive information from minor peers with whom they want to exchange information but who are not willing to verify their own ages with app stores or whose parents are not willing to verify their ages and parental authority with app stores.

63.    With respect to the parental-consent mandate, Plaintiffs use and intend to continue using apps regulated by the Act to send and receive information, and will be presumptively banned

from doing so unless they obtain parental consent for each intended app download and purchase of protected speech content in or using an app. This restricts and burdens their access to, and ability to engage in, fully protected speech. Plaintiffs, moreover, will be unable to share information with or receive information from minor peers with whom they want to exchange information whose parents are unwilling or unable to convey the consents required under the Act. At minimum, being forced to obtain parental consent to download an app or paid speech content within an app creates a barrier that burdens Plaintiffs' ability to engage in protected speech.

## CLAIMS FOR RELIEF

64.     Plaintiffs raise a facial challenge to the Act's provisions codified in Utah Code §§ 13-76-201(1)(a)-(e), 13-76-202(1)-(3), 13-76-301, 13-76-401, and 13-76-402.

65.     These provisions are facially invalid under the First Amendment because their unconstitutional applications are, at minimum, substantial compared to any hypothetically legitimate sweep they might have. *United States v. Stevens*, 559 U.S. 460, 473 (2010).

66.     Plaintiffs also challenge these provisions as unconstitutional as applied to Plaintiffs' use of the app stores and apps covered by the Act.

## COUNT ONE
### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS: FREEDOM OF SPEECH
### (All Challenged Provisions)

67.     Plaintiffs incorporate all prior paragraphs of this Complaint.

68.     The First Amendment to the United States Constitution provides that government "shall make no law … abridging the freedom of speech, or of the press." U.S. CONST. amend. I. The First Amendment protects publishing, disseminating, creating, distributing, and consuming speech. *Brown*, 564 U.S. at 792 & n.1. The First Amendment's protections apply without qualification to speech communicated through the internet, *Reno*, 521 U.S. at 852–53, including

25

through app stores that curate, host, and provide access to libraries of protected content. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 718–19 (2024); *Packingham v. N. Carolina*, 582 U.S. 98, 108 (2017). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

69.     The government cannot bar minors from receiving protected speech without their parent's prior consent. *Brown*, 564 U.S. at 794–95 & 795 n.3. "Minors are entitled to a significant measure of First Amendment protection … and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* at 794 (citation & quotation marks omitted). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable[.]" *Id.* at 795 (quotation omitted). Nor may the government burden adults' ability to access and engage in "fully protected speech" in the name of protecting children. *Free Speech Coal.*, 606 U.S. at 482–87, 490–93 & 493 n.12.

70.     The Act's challenged age-verification, parent-identification, and parental-consent mandates violate Plaintiffs' First Amendment rights by banning and imposing preconditions on delivering and accessing protected speech that effectuates a system of prior restraint; restricting minors' First Amendment rights to access and disseminate constitutionally protected content; and burdening adults' access to fully protected speech, forcing them to sacrifice anonymity or privacy to exercise fundamental rights. These provisions are subject to at least strict scrutiny and cannot survive any level of First Amendment review.

71.     ***Prior restraint.*** The challenged provisions impose prior restraints on several levels, each of which is presumptively unconstitutional and subject to at least strict scrutiny.

72.     First, compelling app stores to collect age-identification information "as a condition

of engaging in protected activity … impose[s] a form of prior restraint" because it formally restricts access to fully protected speech before it can occur and without adjudication. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 586 n.9 (1983) (citing cases); *see also Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 311, 316–17 (1980) (statutory precondition was prior restraint). The age-verification and parent-identification mandates thus constitute prior restraints by themselves. *See Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000) (laws granting the government "power to deny use of a forum in advance of actual expression" are prior restraints) (citation & quotation marks omitted); *e.g.*, *ACLU v. Johnson*, 4 F. Supp. 2d 1029, 1033 (D.N.M. 1998) (state law requiring age verification before permitting access to web content "interfere[d] with the rights of minors to access and view material that to them is protected by the First Amendment" and was therefore unconstitutional), *aff'd*, 194 F.3d 1149 (10th Cir. 1999).

73.     Second, the parental-consent requirement that bans minors from accessing app-store distributed content unless a parent overrides that ban places a further formal preclearance requirement on protected expression. *See Brown*, 564 U.S. at 795 n.3.

74.     Third, the Act's overall age-verification and parental-consent scheme imposes a system of informal prior restraint and proxy censorship because it threatens intermediaries with civil liability to coerce them into censoring users' access to and ability to engage in speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70–71 (1963).

75.     Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights," and bear a "'heavy presumption'" of invalidity—and thus are subject to a more stringent standard than even strict scrutiny. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976) (citation omitted); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979).

The challenged provisions cannot satisfy that standard, which requires showing the provisions supply the *only* means to address a "direct, immediate, and irreparable" interest of the highest magnitude. *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726–27 (Brennan, J., concurring) (same).

76.    ***Content-based restrictions.*** Content-based regulations of speech are presumed unconstitutional and cannot survive review if they do not satisfy strict scrutiny. *Brown*, 564 U.S. at 799. The Act's age-verification, parent-identification, and parental-consent provisions are content-based for two reasons.

77.    First, the age-verification, parent-identification, and parental-consent provisions are content-based because they are justified in terms of protecting children from app store content. *See, e.g.*, Testimony of Sen. Todd Weiler with Melissa McKay, Utah House Econ. Dev. & Workforce Services Comm. Hearing on S.B. 142 (Feb. 19, 2025), https://le.utah.gov/av/committeeArchive.jsp?timelineID=273143 [https://perma.cc/V533-NM8J] (claiming Act is necessary because children face harm when apps are not content-rated "correctly"); *App Store Accountability Act: App Stores Are the Brokers of Digital Harm and Exploitation*, DIGITAL CHILDHOOD ALLIANCE (last visited Dec. 9, 2025) https://www.digitalchildhoodalliance.org/wp-content/uploads/2025/03/Utah_App-Store-Accountability-Act.pdf [https://perma.cc/ASS2-RXF4] (arguing that the Act is needed to prevent the exchange of content that leads to "harm, abuse, and exploitation.").[40] Legislating based on

---

[40] Statements from the bill's sponsors and supporters confirm its content-based focus. *See* Testimony of Senator Todd Weiler, Utah Senate Transportation, Pub. Util., Energy, & Tech. Comm. (Jan. 28, 2025, at 10:30), https://le.utah.gov/av/committeeArchive.jsp?mtgID=19653 [https://perma.cc/KNF9-UJPG] (Bill Sponsor introducing S.B. 142 by stating that a driving motivation for the bill was protecting minors from "pornography" on Instagram); Floor Statement of Representative James Dunnigan, Utah House of Reps. 2025 Gen. Sess. Day 42 (Apr. 3, 2025, at 1:25:35), https://le.utah.gov/av/floorArchive.jsp?markerID=131321 [https://perma.cc/F9NZ-

"concern for [speech's] effect" on a particular audience is "the essence of content-based regulation." *Playboy*, 529 U.S. at 811–12.

78.    Second, the Act's definition of entities subject to the law makes any application of its age-verification, parent-identification, and parental-consent mandates content-based burdens. This is because the Act arbitrarily exempts from the parental-consent requirement apps that provide "direct access to emergency services," and which are operated "by or in partnership with: (i) a government entity; (ii) a nonprofit organization; or (iii) an authorized emergency service provider." Utah. Code § 13-76-404(4)(a), (c), (d). Because the Act thus "defin[es] regulated speech by particular subject matter," and therefore "singles out specific subject matter for differential treatment," *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 169 (2015), its every application is content-based and subject to strict scrutiny. *See Barr v. Am Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619–21 (2020) (plurality op.) (law's content-based coverage exemptions rendered the law's entire operation content-based and subject to strict scrutiny).

79.    ***Strict scrutiny.*** The Act fails strict scrutiny because the State cannot show that any of the challenged provisions' restrictions of speech are both necessary and the least-restrictive means to serve a compelling government interest. *Playboy*, 529 U.S. at 813, 817.

80.    The State has not identified a concrete problem in need of a legislated solution, nor

---

LFJS] (Floor Sponsor criticizing the lack of any third-party industry group—like the MPAA or ESRB—to oversee ratings for apps based on their content "unlike movies or video games."); Governor Spencer Cox (@GovCox), X (Apr. 8, 2025), https://x.com/GovCox/status/1909608926959878358 [https://perma.cc/72CP-52VB] (touting the Act's promotion of "age-appropriate content"). Governor Cox has emphasized that Utah has and will continue to pursue content-based regulation of social media platforms. In a television news interview, he called online content platforms a "cancer" that use "evil" "algorithms" to disseminate information to young people that promote violence. *Utah Gov. Spencer Cox Shares New Details About Charlie Kirk Shooting Suspect: Full Interview*, NBC NEWS (Sept. 14, 2025, at 6:10), https://www.nbcnews.com/meet-the-press/video/utah-gov-spencer-cox-shares-new-details-about-charlie-kirk-shooting-suspect-full-interview-247550021915 [https://perma.cc/BV4K-UMHQ].

has it shown that the Act and each of the challenged provisions is necessary to that solution. If the problem concerns harms to minors from unregulated access to mobile apps, numerous existing solutions are more flexible and capable of being tailored to the needs of each individual child. The government's solution also overrides parental decision-making about how much or how little oversight is needed over each child's mobile app activities by mandating consent each and every time a minor seeks access to any covered app or content, rather than allowing parents to grant broader consent. *See id.* at 826. That the State believes parents are failing to use existing parental control tools effectively is not a compelling government interest that justifies top-down, one-size-fits-all restriction. *See Brown*, 564 U.S. at 803; *accord Playboy*, 529 U.S. at 824.

81.     Nor is the Act necessary to promote parental authority. At every step, the Act's age-verification, parent-identification, and parental-consent mandates prioritize the government's desired content regulation over parental choices. Parents are required to micromanage their children's online access; hand over sensitive proof of identification to do so; and are prevented from providing blanket consents even if they wanted. The Act gives parents *fewer*—not more—options to tailor their families' digital media habits. Far from supporting parents, the Act imposes "what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 794–95, 804.

82.     Even if the State could demonstrate that the Act were necessary to accomplishing some compelling interest, the State cannot show that the Act and each of its challenged provisions is narrowly tailored and the least restrictive means to do so.

83.     The Act is overinclusive because it applies to all mobile applications (apart from the enumerated parental-consent mandate exceptions in Section 13-76-404(4)), and all downloadable content within those mobile applications, without regard for whether each of those apps and that content causes the harms the government alleges the Act addresses. The same is true

insofar as the Act regulates and treats all minors alike, regardless of differences in those minors' development or their parents' preferences. *See Reno*, 521 U.S. at 865–66.

84.    At the same time, the Act is underinclusive because it arbitrarily exempts pre-installed apps, services that are available through browsers and on non-mobile devices that convey the same information, and content (such as comic books, games, movies, and music) that is available in person.

85.    ***Intermediate scrutiny.*** The Act would be unconstitutional even if subjected to intermediate scrutiny, which requires a law (1) to serve a substantial government interest "unrelated to the suppression of free expression" by alleviating in "a direct and material way" harms that are "not merely conjectural," and (2) be narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662–64 (1994) (citation omitted); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487, 491 (1995).

86.    Utah has done nothing to demonstrate either the existence or the magnitude of harm purportedly caused by the mobile apps and downloadable content that the Act regulates, or how the State's chosen solution will help without suppressing more speech than necessary. *See Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021) (holding that city ordinance regulating speech activity near roadways failed intermediate scrutiny because it did not "alleviate[] in a direct and material way a real, non-speculative harm;" city could not show that ordinance did not burden "substantially more speech than necessary;" and city "almost completely failed to even consider alternative measures."). The State has made no effort to explain or substantiate how the Act's speech restrictions relate to or will measurably reduce the purported harms. The First Amendment does not permit the Government to restrict speech and then seek information to justify

31

its actions. *See IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1128 (9th Cir. 2020) (doing so "reflect[s] a fundamental misunderstanding about the State's burden in justifying restrictions on speech").

87.    The Act's broad speech restrictions are the opposite of narrow tailoring: the Act restricts enormous swaths of speech on app-based channels on the theory that some speech for some people is potentially harmful, while arbitrarily exempting classes of similarly situated media.

88.    ***Facial relief warranted.*** A law is facially invalid under the First Amendment if "a substantial number of [its] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation & quotation marks omitted). Facial relief is the natural remedy here because substantially all of the age-verification, parent-identification, and parental-consent provisions' applications are unconstitutional—and even the limited permissible applications to unprotected speech are irrelevant since Utah law *already* restricts online content unprotected for minors, *see City of L.A. v. Patel*, 576 U.S. 409, 418 (2015) (facial challenges concern applications that are not already legitimately authorized by other laws), including Utah law requiring users to verify they are adults before accessing pornography websites. *See* Utah Code Ann. § 78B-3-1001, *et seq*.

89.    At the first step, restricting access to information behind an age-verification wall "necessarily" burdens the "right to access speech" in every case. *Free Speech Coal.*, 606 U.S. at 495. At the second step—weighing the challenged provisions' unconstitutional applications against their constitutional ones—the substantial and "across the board" effect of the challenged provisions is to regulate speech without constitutional justification. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618–19 (2021). The facial analysis thus boils down to a comparison between the provisions' substantial regulation of protected speech (none of which the State can show is constitutional) versus the provisions' catch-as-catch-can regulation of *unprotected* speech or

conduct the provisions *may incidentally* reach. The provisions are thus unconstitutional. Prophylactic blanket regulations of communication enacted to shield minors from potential exposure to unprotected speech present the archetype of overbroad legislation that "turns the First Amendment upside down." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). "[Q]uarantining the general reading public … to shield juvenile innocence … burn[s] the house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957); *see also Reno*, 521 U.S. at 882 (same).

90.     ***Defects not severable.*** The Act's unconstitutional and interlocking age-verification, parent-identification, and parental-consent mandates are integral to the Act, such that no other provisions could operate without them. The entire Act—and not just the challenged provisions— accordingly requires invalidation.

91.     Unless invalidated and enjoined, Utah Code sections 13-76-201(1)(a)-(e), 13-76-202(1)-(3), 13-76-301, 13-76-401, and 13-76-402 will deprive Plaintiffs of their First Amendment rights and cause them to suffer irreparable injuries.

## COUNT TWO

### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS: VOID FOR VAGUENESS
### (Utah Code §§ 13-76-101(18)(d) and 13-76-201(1)(c))

92.     Plaintiffs incorporate all prior paragraphs of this Complaint.

93.     "It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Cir.*, *Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) (cleaned up).

94.     Vagueness in a law that regulates expression "raises special First Amendment concerns because of its obvious chilling effect on free speech," *Brown*, 564 U.S. at 807 (Alito, J.

concurring) (citation & quotation marks omitted), requiring a "'more stringent'" test, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (citation omitted).

95.     Standards of "permissible statutory vagueness" are "strict in the area of free expression" and the "government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 432–33 (1963).

96.     Utah Code §§ 13-76-101(18)(d) and 13-76-201(1)(c) require app stores to revoke a minor's access to content even to which their parent has consented, *id.* § 13-76-201(1)(c), any time an application makes a change to its terms that "materially changes" its "functionality" or "user experience," *id.* § 13-76-101(18)(d). The Act does not define what such a "material" change might include, and neighboring provisions indicate that it requires app stores to evaluate the ideas, information, and other types of content an application makes available. *Id.* § 13-76-101(18)(b).

97.     Without reasonable certainty what these inherently subjective terms mean, the "predictable tendency" is that app stores will overzealously revoke minors' access to information to avoid liability by "steer[ing] 'wide of the unlawful zone.'" *Counterman v. Colorado*, 600 U.S. 66, 77–78 (2023) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

98.     Unless declared invalid and enjoined, Utah Code §§ 13-76-101(18)(d) and 13-76-201(1)(c) will for this additional reason unlawfully deprive Plaintiffs of their First Amendment and Due Process rights, causing them to suffer irreparable injuries.

## PRAYER FOR RELIEF

99.     Plaintiffs respectfully request that the Court:

a.     Declare that Utah Code sections 13-76-201(1)(a)-(e), 13-76-202(1)-(3), 13-76-301, 13-76-401, and 13-76-402 violate the First and Fourteenth Amendments of the United States Constitution on their face, and at least to the extent they are applied to restrict access to

mobile applications that disseminate expressive content—including books, business information, content creation tools, education, entertainment, financial information, games, magazines, movies, music, news, reference information, social networking content, and travel information, among other materials—and to restrict access to such content within such applications;

b. Declare that Utah Code sections 13-76-201(1)(a)-(e), 13-76-202(1)-(3), 13-76-301, 13-76-401, and 13-76-402 are unconstitutional as applied to Plaintiffs;

c. Declare that the unconstitutional provisions are integral to and inseverable from any remaining portions of the Act, such that the entire Act must be declared invalid;

d. Preliminarily and permanently enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to enforce the unconstitutional provisions of the Act, or at least to the extent they are applied to restrict access to mobile applications that disseminate clearly expressive content;

e. Enter judgment in favor of Plaintiffs;

f. Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

g. Award Plaintiffs all other relief as the Court deems just and proper.

Respectfully submitted this 11th day of February 2026.

PARR BROWN GEE & LOVELESS

/s/   David C. Reymann
        David C. Reymann

*Attorney for Plaintiffs*