Adam S. Sieff*
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800
adamsieff@dwt.com

Abigail B. Everdell*
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 603-6468
abigaileverdell@dwt.com

David C. Reymann (UT Bar No. 8495)
Kade N. Olsen (UT Bar No. 17775)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
dreymann@parrbrown.com
kolsen@parrbrown.com

Ambika Kumar*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 622-3150
ambikakumar@dwt.com

David M. Gossett*
Celyra Myers*
Azeezat Adeleke*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 973-4200
davidgossett@dwt.com
celyramyers@dwt.com
azeezatadeleke@dwt.com

*Attorneys for Plaintiffs*
*Pro hac vice applications forthcoming*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| M.M., *by and through next friend* EMILY MCMASTER, N.G., *by and through next friend* ELISA PARDO, and J.S., *by and through next friend* ERIN SULLIVAN, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEREK BROWN, *in his official capacity as Utah Attorney General*, and KATIE HASS, *in her official capacity as Director of the Utah Division of Consumer Protection*, <br><br> *Defendants*. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW** <br><br> Civil Action No. 2:26-cv-125 <br><br> Judge: <br><br> Magistrate Judge: |

## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs M.M., by and through next friend Emily McMaster, N.G., by and through next friend Elisa Pardo, and J.S., by and through next friend Erin Sullivan, each by and through their counsel, submit this Motion for Preliminary Injunction and Memorandum of Law, along with their declarations, and the declaration of Adam Sieff and accompanying exhibits. Plaintiffs seek to preliminarily enjoin enforcement of challenged provisions of the Utah App Store Accountability Act, Utah Code § 13-76-101 *et seq.*, on the grounds that they violate the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are likely to succeed on the merits of their claims, and the other preliminary injunction factors counsel in favor of granting Plaintiffs' motion. Plaintiffs also respectfully request a hearing on this motion.

Respectfully submitted this 11th day of February 2026.

PARR BROWN GEE & LOVELESS

/s/   *David C. Reymann*
David C. Reymann

*Attorney for Plaintiffs*

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    A.    App stores are libraries for digital content............................................................ 2

    B.    Plaintiffs access app stores for educational, artistic, and political speech.............. 3

    C.    Existing tools and laws already empower parents to control access to mobile apps and protect minors from adult content................................................ 4

    D.    The Act age-gates and imposes a mandatory parental preclearance regime for apps and app-based information........................................................ 5

LEGAL STANDARD............................................................................................................ 8

ARGUMENT ........................................................................................................................ 9

I.    Plaintiffs Are Likely To Prevail On The Merits. ............................................................. 9

    A.    The Act restricts access to fully protected speech. ................................................. 9

    B.    Strict scrutiny applies to the challenged provisions............................................ 10

        1.    The challenged provisions create a system of prior restraint.................... 10

        2.    The challenged provisions cannot be justified without reference to the effect of content on its audience. ....................................................... 13

        3.    The challenged provisions are content-based because of the Act's coverage definition.................................................................................... 14

    C.    The challenged provisions fail any level of First Amendment scrutiny. .............. 15

        1.    The challenged provisions are not necessary to directly and materially address any real, compelling interest....................................... 15

        2.    The challenged provisions are not the least restrictive means, much less narrowly tailored. ........................................................................... 16

        3.    The challenged provisions are also substantially underinclusive. ............ 18

        4.    The challenged provisions fail even intermediate scrutiny....................... 19

    D.    The Act's "material change" provision is unconstitutionally vague. .................. 21

    E.    The Act's challenged provisions are facially invalid........................................... 22

II.    The Remaining Factors Favor A Preliminary Injunction. ................................................ 24

III.    The Court Should Not Require A Bond.................................................................... 25

CONCLUSION.................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*ACLU v. Johnson*,
  4 F. Supp. 2d 1029 (D.N.M. 1998), *aff'd*, 194 F.3d 1149 (10th Cir. 1999) ...........................12

*ACLU v. Johnson*,
  194 F.3d 1149 (10th Cir. 1999) ...................................................................................................24

*Am. Target Advert., Inc. v. Giani*,
  199 F.3d 1241 (10th Cir. 2000) ...................................................................................................12

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021)..............................................................................................................21, 23

*Angelilli v. Activision Blizzard, Inc.*,
  781 F. Supp. 3d 691 (N.D. Ill. 2025) ...........................................................................................16

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)......................................................................................................................13

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002).................................................................................................................17, 23

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) ...................................................................................................24

*Baggett v. Bullitt*,
  377 U.S. 360 (1964)......................................................................................................................21

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963).................................................................................................................10, 11

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  591 U.S. 610 (2020)......................................................................................................................15

*Boos v. Barry*,
  485 U.S. 312 (1988)......................................................................................................................13

*Brewer v. City of Albuquerque*,
  18 F.4th 1205 (10th Cir. 2021) ...............................................................................................20, 21

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011)............................................................................................................ *passim*

## TABLE OF AUTHORITIES (continued)

Page(s)

*Butler v. Michigan,*
    352 U.S. 380 (1957)........................................................................................23

*Chamber of Com. of U.S. v. Edmondson,*
    594 F.3d 742 (10th Cir. 2010) ......................................................................24

*City of L.A. v. Patel,*
    576 U.S. 409 (2015)........................................................................................23

*Comp. & Commc'ns Indus. Ass'n v. v. Paxton,*
    747 F. Supp. 3d 1011 (W.D. Tex. 2024)......................................................17

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
    --- F. Supp. 3d ----, 2025 WL 3754045 (W.D. Tex. Dec. 23, 2025)............... *passim*

*Counterman v. Colorado,*
    600 U.S. 66 (2023)..........................................................................................22

*Courtright v. Epic Games, Inc.,*
    795 F. Supp. 3d 1156 (W.D. Mo. 2025) ......................................................16

*Edenfield v. Fane,*
    507 U.S. 761 (1993)........................................................................................20

*Elrod v. Burns,*
    427 U.S. 347 (1976)........................................................................................24

*Epic Games, Inc. v. Apple, Inc.,*
    67 F.4th 946 (9th Cir. 2023) ...........................................................................2

*Fed. Election Comm'n v. Cruz,*
    596 U.S. 289 (2022)........................................................................................20

*Free Speech Coal., Inc. v. Paxton,*
    606 U.S. 461 (2025)............................................................................ *passim*

*Free Speech Coal., Inc. v. Rokita,*
    738 F. Supp. 3d 1041 (S.D. Ind. 2024), *vacated on other grounds,*
    2025 WL 2027434 (7th Cir. July 15, 2025)..................................................11

*Free the Nipple-Fort Collins v. City of Fort Collins,*
    916 F.3d 792 (10th Cir. 2019) ......................................................................24

*Greater New Orleans Broad. Ass'n v. United States,*
    527 U.S. 173 (1999)........................................................................................20

iv

# TABLE OF AUTHORITIES (continued)

Page(s)

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ............................................................................................21

*Interstate Cir., Inc. v. City of Dallas,*
    390 U.S. 676 (1968) ...............................................................................11, 21

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ..........................................................................................9

*Mahanoy Area Sch. Dist. v. B.L.,*
    594 U.S. 180 (2021) ........................................................................................16

*McCraw v. City of Oklahoma City,*
    973 F.3d 1057 (10th Cir. 2020) ......................................................................21

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.,*
    460 U.S. 575 (1983) ........................................................................................11

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) .................................................................9, 20, 22, 23

*N.Y. Times Co. v. United States,*
    403 U.S. 713 (1971) ........................................................................................11

*NAACP v. Button,*
    371 U.S. 415 (1963) ........................................................................................21

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ........................................................................................10

*NetChoice v. Carr,*
    789 F. Supp. 3d 1200 (N.D. Ga. 2025) ....................................................14, 17

*NetChoice, LLC v. Bonta,*
    113 F.4th 1101 (9th Cir. 2024) ...............................................11, 17, 22, 23

*NetChoice, LLC v. Bonta,*
    770 F. Supp. 3d 1164 (N.D. Cal. 2025) .........................................................14

*NetChoice, LLC v. Fitch,*
    787 F. Supp. 3d 262 (S.D. Miss. 2025).....................................................14, 17

*NetChoice, LLC v. Griffin,*
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............................................17

## TABLE OF AUTHORITIES (continued)

Page(s)

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025) .........................................................................14

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024) ........................................................................14, 17, 19

*NetChoice, LLC v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025) .............................................................10, 12, 14, 17

*Nken v. Holder*,
    556 U.S. 418 (2009) .........................................................................................................24

*Packingham v. N. Carolina*,
    582 U.S. 98 (2017) ...........................................................................................................23

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .....................................................................................................14, 15

*Reno v. ACLU*,
    521 U.S. 844 (1997) .............................................................................................. *passim*

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) .........................................................................................................20

*S. Utah Drag Stars v. City of St. George*,
    677 F. Supp. 3d 1252 (D. Utah 2023) ...........................................................................25

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) .........................................................................................................11

*Smith v. Daily Mail Publ'g Co.*,
    443 U.S. 97 (1979) ...........................................................................................................10

*Snyder v. Phelps*,
    562 U.S. 443 (2011) .........................................................................................................16

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ......................................................................................................9, 16

*Stahl v. City of St. Louis*,
    687 F.3d 1038 (8th Cir. 2012) .......................................................................................22

*Students Engaged in Advancing Texas v. Paxton*,
    --- F. Supp. 3d ----, 2025 WL 3731733 (W.D. Tex. Dec. 23, 2025).............................. *passim*

vi

**TABLE OF AUTHORITIES (continued)**

Page(s)

*Students Engaged in Advancing Texas v. Paxton*,
765 F. Supp. 3d 575 (W.D. Tex. 2025)...............................................................17, 19

*Troxel v. Granville*,
530 U.S. 57 (2000).........................................................................................25

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994).......................................................................................19

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000).....................................................................9, 13, 15, 16

*United States v. Sup. Ct. of New Mexico*,
839 F.3d 888 (10th Cir. 2016) .........................................................................23

*United States v. Williams*,
553 U.S. 285 (2008)........................................................................................21

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748, 756-57 & 757 n.15 (1976) ..........................................................9

*Vance v. Universal Amusement Co., Inc.*,
445 U.S. 308 (1980)........................................................................................11

*Verlo v. Martinez*,
820 F.3d 1113 (10th Cir. 2016) .........................................................................8

**State Cases**

*Vega v. Jordan Valley Med. Ctr., LP*,
449 P.3d 31 (Utah 2019)................................................................................25

**Federal Statutes**

15 U.S.C. § 6501 *et seq.*..................................................................................6

**State Statutes**

Utah Code § 13-11a-4(1)(b)............................................................................8

Utah Code § 13-76-101.............................................................1, 5, 7, 8, 11, 21, 22

Utah Code § 13-76-201..............................................................................5, 6, 7, 8

Utah Code § 13-76-202............................................................................5, 7, 10, 25

**TABLE OF AUTHORITIES (continued)**

Page(s)

Utah Code § 13-76-301.........................................................................................10, 25

Utah Code § 13-76-401....................................................................................8, 10, 25

Utah Code § 13-76-402.........................................................................................10, 25

Utah Code § 13-76-404.....................................................................................6, 14, 19

Utah Code § 78B-3-1001........................................................................................4, 17

Utah Code § 78B-3-1002........................................................................................4, 17

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................................ *passim*

**Other Authorities**

11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2954 (3d ed.) ....................................25

## INTRODUCTION

The Utah App Store Accountability Act, Utah Code § 13-76-101 *et seq*., requires everyone in Utah to prove their age before downloading mobile apps or accessing paid content within those apps. If the viewer is a minor, they must also obtain parental consent to download an app or access its content. The Act thus presumptively bans teens—like Plaintiffs M.M., N.G., and J.S.—from accessing even political and educational material without their parents' permission. Parents must prove their authority to provide that permission. And parents who grant permission are forced to review the apps and paid content their child sees, even if—like M.M.'s mother—they believe such surveillance undermines their child's development.

The Act violates the First Amendment on its face—and indeed, a federal court enjoined as facially overbroad a substantively identical Texas law under the First Amendment less than two months ago. *See Students Engaged in Advancing Texas v. Paxton*, --- F. Supp. 3d ----, 2025 WL 3731733, at *1, *7–9 (W.D. Tex. Dec. 23, 2025) ("*SEAT II*"); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, --- F. Supp. 3d ----, 2025 WL 3754045, at *1, *7–*9 (W.D. Tex. Dec. 23, 2025) ("*CCIA II*"). This is because governments have no "free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794–95 (2011). Yet Utah has attempted just that—creating a system of content-based prior restraints that supplants parents' freedom to moderate their children's access to apps. This violates the rule that speech "neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," as well as the rule that the government has no "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 & 795 n.3 (citation & quotation marks omitted). Just as the State could not compel a bookstore to screen patrons and stop minors from buying books without their parents' permission, the State cannot ban minors from downloading

1

apps or paid content without such consent. Strict scrutiny thus applies here, and the State cannot provide sufficient justification for the Act.

Plaintiffs are high school students in Utah whom the Act will restrict from communicating, accessing information, and engaging in protected expression. Because Plaintiffs will suffer the irreparable loss of fundamental freedoms if the Act takes effect in May 2026, they bring this motion to preliminarily enjoin enforcement of the Act's challenged provisions.

## BACKGROUND

### A.    App stores are libraries for digital content.

App stores allow anyone with a smartphone and an internet connection to access the accumulated sum of virtually all recorded human knowledge. Through Apple's iOS App Store alone, more than 1 billion people have access to tens of millions of apps, published by more than 30 million app developers. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023). Other major app stores in the United States include the Google Play Store for Android OS devices, the Amazon AppStore for Fire Tablets and Fire TV systems, the Galaxy Store for Samsung devices, and the Microsoft Store for Surface devices. Most Americans, and nearly all teenagers, use app stores to access, engage with, and contribute to the wealth of information and expression disseminated online. Sieff Decl. Exs. 1-3. Mobile apps are thus a major channel for humankind— and especially young people—to speak and learn. M.M. Decl. ¶¶ 3-11, 18; N.G. Decl. ¶¶ 3-8, 15; J.S. Decl. ¶¶ 3-10; 15.

The types of information distributed through app stores are "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 852 (1997) (cleaned up). Some applications, like internet browsers, are tools to search and discover information online. Others, such as WhatsApp, Discord, and Slack, provide messaging services for direct communication. Spotify, Netflix, Kindle, Audible, and similar apps contain libraries of copyrighted music, movies, television shows, books, audiobooks,

and podcasts. Coursera, Codecademy, and Duolingo provide access to educational material. Media organizations—the Salt Lake Tribune, the New York Times, the Wall Street Journal, ESPN, Sports Illustrated, the Atlantic, and many others—offer apps that distribute reporting, essays, and videos. Some apps, like Substack, Medium, and Note, function as publishing studios to create and share music, writing, and other expressive content. Gaming apps like Terraria and Minecraft publish creative interactive worlds for exploration and entertainment. And of course, social media apps like YouTube, X, Facebook, Instagram, TikTok, Reddit, and Snapchat provide fora for sharing every possible kind of digital media.

### B.    Plaintiffs access app stores for educational, artistic, and political speech.

Plaintiffs are high-school students in Utah who the Act will restrict from communicating, accessing information, and engaging in protected expression. M.M. is a 16-year old high school sophomore, musician, and hobby photographer who uses apps to study, learn knitting and guitar, follow current events, socialize, and share her music and photography. M.M. Decl. ¶¶ 1-2, 5-11. N.G. is a 16-year old high school sophomore, competitive tennis player, and wellness enthusiast who accesses app-store distributed content to train, practice his religion, and participate in political debates. N.G. Decl. ¶¶ 1-7, 9-10. J.S. is a 15-year old high school sophomore, budding chef, and soccer player who uses mobile apps to publish videos and information showcasing her soccer skills, learn new recipes, study, follow current events, communicate with friends and teammates, and comment on public affairs. J.S. Decl. ¶¶ 1-2, 4-9.

Mobile phones and apps are the dominant vehicles for young people's speech and communication. Sieff Decl. Exs. 1-3; M.M. Decl. ¶¶ 3-5, 18; N.G. Decl. ¶¶ 3-5, 7-8, 10, 15; J.S. Decl. ¶¶ 3-5, 10, 15. Teens use apps for many things, including political advocacy, education, community, and creative expression. Sieff Decl. Ex. 4; M.M. Decl. ¶¶ 4-11; N.G. Decl. ¶¶ 3-8, 10-11; J.S. Decl. ¶¶ 3-12. Many apps provide training grounds for citizenship. Sieff Decl. Ex. 4;

3

M.M. Decl. ¶ 11. Apps offer an essential medium for young people to send and receive political and social messages. M.M. Decl. ¶¶ 4-5, 8-9; N.G. Decl. ¶¶ 4-7; J.S. Decl. ¶¶ 3-5, 8-10. And apps enable young people to find purpose and community. Sieff Decl. Ex. 9. M.M. also uses apps to inspire her music and knitting projects and to gain new perspectives on current events. M.M. Decl. ¶¶ 5-9. J.S. uses apps to learn about new art styles and recipes and learn about ways to improve her fitness. J.S. Decl. ¶¶ 6-7.  And N.G. has used apps to study Jewish texts and participate in his religious community.  N.G. Decl. ¶10.

**C.    Existing tools and laws already empower parents to control access to mobile apps and protect minors from adult content.**

App stores, mobile devices, and apps all allow parents to tailor their children's online experiences. *See* Sieff Decl. Exs. 6 ¶¶ 8-9, 7 ¶¶ 11, 29-36, 8 ¶¶ 35-38. App stores allow parents to require parental consent for children to download some or all apps. Device makers permit parents to manage children's online activities, including use of particular applications. *Id.* Exs. 16, 17. And third-party apps allow parents to control access to their kids' social media and other accounts. *Id.* Exs. 12-15. With these tools, families are well-equipped to guide their children's app usage. *See* McMaster Decl. ¶¶ 3-4; M.M. Decl. ¶ 23; N.G. ¶ 19; J.S. ¶ 19. Sieff Decl. Exs. 18-21 (scientific research).

Utah also already regulates children's access to content that lacks First Amendment protection. Since May 2023, S.B. 287 has required commercial entities that "knowingly and intentionally publish[] or distribute[] material harmful to minors on the Internet"—defined as material that "appeal[s] to, or is designed to pander to, the prurient interest" or includes depictions of specified sexual acts and portions of the human anatomy that are "patently offensive with respect to minors"— "to perform reasonable age verification methods to verify the age of an individual attempting to access the material." Utah Code §§ 78B-3-1001(5); 78B-3-1002(1); 2023

4

Utah Laws Ch. 252 (S.B. 287). The Supreme Court upheld the constitutionality of a virtually identical statutory provision in *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 482 (2025), on the grounds that it regulated "only speech that is obscene to minors."

### D.    The Act age-gates and imposes a mandatory parental preclearance regime for apps and app-based information.

Despite these tools and laws, Utah passed the Act, which app stores and developers must begin complying with on May 6, 2026. Utah Code §§ 13-76-201, 13-76-202.

The Act governs providers of "app store[s]" operating in Utah and "developer[s]" offering apps to users in Utah through app stores. *Id*. Purportedly enacted to prevent minors from accessing age-inappropriate content, Sieff Decl. Ex. 24, the Act in fact creates an age-verification and parental-consent regime, under which minors may not download apps or paid content within apps absent parental consent.

***Scope and exemptions.*** The Act broadly governs app stores in Utah—defined as any "publicly available website, software application, or electronic service that allows users to download apps from third-party developers onto a mobile device," such as a smartphone or tablet. *Id.* § 13-76-101(5)–(6). It further regulates "developer[s]," who own or control apps made available through app stores in the state. *Id.* § 13-76-101(8).

The Act applies only to apps a user downloads—and paid purchases within apps—on mobile devices, not to pre-installed apps, software available through web browsers, or apps on non-mobile devices such as internet-connected televisions. This leads to inconsistent regulation.

*First*, the same app sometimes is covered and sometimes falls outside the Act, depending on how it is distributed. The Apple Music app, for example, comes pre-installed on Apple iPhones and iPads, but must be downloaded on Android phones or Samsung TVs. Of these distribution options, the parental-consent requirement applies only to users who download the Apple Music

5

app to an Android phone. This inconsistent regulation occurs not only between different users, but even across the same individual's different devices.

*Second*, materially identical apps are treated differently on the same devices: The iMessage app is preinstalled on an iPhone, but Signal must be downloaded. The Act regulates only the latter.

*Third*, the requirement for parental consent before a minor "make[s] an in-app purchase," Utah Code § 13-76-201, applies differently to the same content across users. A minor who has the Disney+ app and a Disney subscription does not need parental consent to download *Finding Nemo*, yet another minor requires consent to rent the same movie in the Apple TV app—and neither needs consent to purchase the DVD at Best Buy.

The Act also exempts apps that: (1) provide users with "direct access to emergency services," including 911, crisis hotlines, or "emergency assistance services legally available to minors," (2) "limit[] data collection to information necessary to provide emergency services in compliance with" the Children's Online Privacy Protection Act, 15 U.S.C. § 6501 *et seq.*, (3) "provide[] access without requiring account creation or collection of unnecessary personal information," and (4) are "operated by or in partnership with a government entity, a nonprofit organization, or an authorized emergency service provider." Utah Code § 13-76-404(4) (cleaned up). This provision results in arbitrary carve-outs. A Utah teen in emotional distress would be able to download the government-affiliated American Red Cross Emergency App without restriction, but the same teen would be presumptively barred from downloading 7 Cups, a popular mental health app that provides access to counseling services and a 24/7 hotline.[1]

***Age-verification and parent-identification mandates.*** Before anyone in Utah may create

---

[1] 7 Cups: Online Therapy and Chat, https://perma.cc/MS6Y-GWRA (last accessed Feb. 10, 2026) (app offering "24/7 emotional support through 1-on-1 text, chats, and video with trained listener hotlines" and "counseling services with licensed professionals").

an account to access an app store, the app store must "request age information from the individual" and "verify the individual's age category" using either "commercially available methods that are reasonably designed to ensure accuracy" or "an age verification method or process" that complies with unspecified rules to be developed by the Utah Division of Consumer Protection. Utah Code §13-76-201(1). If the store determines that the user is under 18, it must deny her access to the content until she "affiliate[s] with a parent account." *Id.* § 13-76-201(1)(b).

To that end, any individual identified as a minor must identify his or her parent or guardian, and app store owners must then employ age and identity verification tools to confirm that the prospective "parent account" in fact belongs to an adult parent or guardian of the minor. *See id.*; *id.* § 13-76-101(16), (19). The Act does not explain what information is sufficient to prove legal parental authority.

**Parental-consent mandate.** Affiliating with a verified parent is only the start. Each time a teen seeks to download an app—or purchase content within an already-downloaded app—they must "obtain verifiable parental consent" from their parent. *Id.* § 13-76-201(1)(b)(ii). Consent requires app stores to provide the parent with any age rating or content description information available for the app or in-app purchase. *Id.* § 13-76-101(17). Teens who cannot obtain consent may not access the app or content. *Id.* App stores also must share consent information with app developers, *id.* § 13-76-201(d), who must prohibit teens from accessing their apps or paid content absent consent, *id.* § 13-76-202(1).

Families that want no part of this state-ordered surveillance have no choice. Parents must separately consent to each and every individual download or purchase sought by their child because the Act does not permit parents to authorize multiple downloads or purchases. *See id.* § 13-76-201(1)(b). And even after a parent consents, app stores must seek consent anew whenever

there is a "[s]ignificant change" affecting the type of data the app collects, stores, or shares; its age rating or content descriptions; or its available monetization features. *Id.* §§ 13-76-101(18); 13-76-201(1)(c). The app store must also revoke consent where there are "material[] changes" to the app's "functionality" or "user experience." *Id.*

**Enforcement.** A minor or their parent may file a civil suit against an app store provider or developer for alleged violations of the Act's age verification and parental consent requirements. *Id.* § 13-76-401(2). Courts may award actual damages or $1,000 per violation, whichever is greater. *Id.* § 13-76-401(3). Additionally, the Act provides that any app store provider or developer that "knowingly misrepresent[s] information in the parental consent disclosure" has engaged in "a deceptive trade practice" under Utah law. *Id.* §§ 13-76-201(2)(b); 13-76-401(1) (citing *id.* § 13-11a-3). Under existing law, either the state of Utah or a minor and her parents can bring a civil action on the basis of an alleged deceptive trade practice. *See id.* § 13-11a-4(1)(b). Remedies include injunctive relief and money damages, with the latter being the greater of actual damages or $2,000. *Id.* § 13-11a-4(1)(b). Given the millions of app-store and app users in Utah, penalties under the Act could prove extraordinary.

## LEGAL STANDARD

A preliminary injunction should be granted where plaintiffs show that (1) they will likely prevail on the merits, (2) they will suffer irreparable injury absent relief, (3) their injury outweighs any harm to the party they seek to enjoin, and (4) the public interest supports an injunction. *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016). "In the First Amendment context, 'the likelihood of success on the merits will often be the determinative factor' because of the seminal importance of the interests at stake." *Id.* (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub. nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)). An injunction is warranted here.

## ARGUMENT

### I.    Plaintiffs Are Likely To Prevail On The Merits.

#### A.    The Act restricts access to fully protected speech.

The First Amendment protects the creation, dissemination, and right to access ideas and expression. *See Brown*, 564 U.S. at 792 & n.1; *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 & 757 n.15 (1976). These protections apply without qualification to online media, *Reno*, 521 U.S. at 852–53, including information and ideas communicated through mobile applications distributed through app stores. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 718–19 (2024). They also apply to minors, who "are entitled to a significant measure of First Amendment protection," and whose rights to engage in fully protected speech "cannot be suppressed." *Brown*, 564 U.S. at 794–95 (citation omitted).

Online age-screens are always subject to First Amendment scrutiny because they "necessarily" burden the "First Amendment right to access speech." *Free Speech Coal.*, 606 U.S. at 495. The government thus "bears the burden of proving the constitutionality of its actions" that abridge these protections, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000), under some form of "heightened judicial scrutiny." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557, 563 (2011); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524, 532 (2022). Critically, the Act here is fundamentally unlike the Texas law upheld in *Free Speech Coalition* because it targets and restricts access to "fully protected" materials, not adult content minors have no First Amendment right to access. 606 U.S. at 482–85, 490–93 & n.12.

The State cannot—as some lawmakers have suggested[2]—pass off its censorship as mere

---

[2] Testimony of Sen. Todd Weiler with Melissa McKay, Utah House Economic Development and Workforce Services Committee Hearing on S.B. 142 (Feb. 19, 2025, at 19:40), https://tinyurl.com/2d8femcy (bill sponsor testifying that the Act is not content-based, but is instead "a contract bill.") (last visited Feb. 9, 2026); Sieff Decl. Ex. 25 at 2:8-2:12.

restriction of minors' capacities to contract. *Cf.* Texas's Opp. to Mot. for Prelim. Inj., *Students Engaged in Advancing Texas v. Paxton*, No. 1:25-cv-01662-RP, ECF No. 28 at 15-16, 19 (W.D. Tex. filed Nov. 7, 2025) (also attempting this argument). "[P]rohibiting minors from contracting to access [a] plethora of protected speech cannot be reduced to a regulation of commercial conduct." *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 950 (S.D. Ohio 2025) (citation omitted). The Supreme Court rejected a similar gambit in *Brown*, holding that restricting "the sale or rental" of content restricts speech, 564 U.S. at 792 n.1, despite California's claim that its law "cover[ed] only commercial transactions entered into by minors outside the presence of parents," Pet.'s Reply Br., *Brown v. Ent. Merchs. Ass'n*, 2010 WL 4034925, at *3–4, *11–18 (U.S. filed Oct. 8, 2010).

The Act's age-verification and parent-identification mandates, Utah Code §§ 13-76-201(1)(a)-(e), 13-76-202(1)-(3), 13-76-301, 13-76-401, and 13-76-402, and its parental-consent mandate, *id.* §§ 13-76-101(17), 13-76-201(1)(b)(ii), 13-76-201(1)(c)-(d), 13-76-202(1), fail any First Amendment standard. *See SEAT II*, 2025 WL 3731733, at *1, *7–9; *CCIA II*, 2025 WL 3754045, at *1, *7–9.

### B. Strict scrutiny applies to the challenged provisions.

The Court should apply strict scrutiny for three independent reasons.

#### 1. The challenged provisions create a system of prior restraint.

Strict scrutiny applies because the challenged provisions subject speech to several overlapping prior restraints. A prior restraint is any government action that in substance prevents or deters speech without a prior judicial determination "that such publications may lawfully be banned." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70–71 (1963). Prior restraints present "the most serious and the least tolerable infringement on First Amendment rights," and bear a "heavy presumption" of invalidity. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979). To survive review, a prior restraint

must be the *only* means to address a "direct, immediate, and irreparable" interest of the highest magnitude—a standard more stringent than strict scrutiny. *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726–27 (Brennan, J., concurring) (same).

At the outset, the Act's overall age-verification, content-classification, and preclearance regime effects a prior restraint by requiring app stores and developers to classify fully protected speech into suitable "[a]ge categor[ies]," Utah Code § 13-76-101(1), and restrict how that content is disseminated. *See Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 678–88 (1968) (prior restraint to require theaters to classify films as "suitable for young persons" before screening them); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 n.8 (1975) (similar); *Bantam Books*, 372 U.S. at 67–69 (subjecting bookstores to supervision "inhibit[ed] the circulation of publications"). The Ninth Circuit enjoined a similar regime in *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024), holding that forcing online intermediaries to classify and block potentially harmful content "deputize[d] private actors into censoring speech" and failed strict scrutiny.

Each set of challenged provisions also independently constitutes a prior restraint. The age-verification and parent-identification mandates "impose[] a form of prior restraint" because they compel users—teens and adults—to provide age-identification and parental-authority documentation "as a condition of engaging in protected activity," thus preventing access to fully protected speech before it can occur and without adjudication. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 586 n.9 (1983); *see Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 311, 316–17 (1980) (statutory precondition was prior restraint). Many Utahns would stop using apps rather than provide ID. And some parents would rather deny their children access to apps than provide proof of parental authority. In fact, 66 percent of Americans "are not comfortable sharing their identification documents or biometric information with online

11

platforms," and 70 percent are "uncomfortable with their children using such methods." *Free Speech Coal., Inc. v. Rokita*, 738 F. Supp. 3d 1041, 1049 (S.D. Ind. 2024) (cleaned up), *vacated on other grounds*, 2025 WL 2027434 (7th Cir. July 15, 2025). Their reluctance is understandable. *See* E. Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 Stan. Tech. L. Rev. 173, 205 n.129, 206–08 (2025) (privacy risks of age verification cause self-censorship). These state-imposed barriers to speech are prior restraints. *See, e.g.*, *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000) (laws granting the government "power to deny use of a forum in advance of actual expression" are prior restraints) (citation & quotation marks omitted); *ACLU v. Johnson*, 4 F. Supp. 2d 1029, 1033 (D.N.M. 1998) (state law requiring age verification before permitting access to web content "interfere[d] with the rights of minors to access and view material that to them is protected by the First Amendment" and was therefore unconstitutional), *aff'd*, 194 F.3d 1149 (10th Cir. 1999).

The parental-consent mandate adds another layer of prior restraint by establishing a *state-backed* "parental veto" over the information a teenager may access. *Brown*, 564 U.S. at 795 n.3. Plaintiffs, who have a constitutional right to access non-obscene content in app stores' libraries, are banned from doing so by default. *See* McMaster Decl. ¶¶ 7-9. This makes the Act akin to the law invalidated in *Brown*, 564 U.S. at 794–95, which banned minors from purchasing or renting constitutionally protected video games without parental approval, and not the law upheld in *Free Speech Coal.*, 606 U.S. at 482, which "regulates only speech that is obscene to minors." As in *Brown*, the Act's preclearance mandate unlawfully burdens the fully protected speech both of teens and those who wish to speak with them. *See also, e.g.*, *Yost*, 778 F. Supp. 3d at 932, 954–55 (invalidating comparable age-verification and parental-consent regime under *Brown*).

**2.      The challenged provisions cannot be justified without reference to the effect of content on its audience.**

Strict scrutiny also applies because the challenged provisions are content-based. "A law can regulate the content of protected speech, and thereby trigger strict scrutiny, either 'on its face' or in its justification." *Free Speech Coal.*, 606 U.S. at 482 (citation omitted). The latter category includes laws that cannot be justified without reference to "the direct impact that speech has on its listeners." *Boos v. Barry*, 485 U.S. 312, 321 (1988); *Playboy*, 529 U.S. at 811–12 (same).

The challenged provisions are content-based under this test. The Act's overall premise—that minors like Plaintiffs must be shielded from fully protected but supposedly inappropriate information—is focused on content. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) (strict scrutiny applies to laws "designed to protect minors from viewing harmful materials") (citing *Playboy*, 529 U.S. at 825–26). Utah indisputably passed the Act for this reason. *See* Sieff Decl. Ex. 25 at 3:26-34 (S.B. 142 co-drafter stating that Act is necessary because app-based content is not age-rated "correctly"); *id.* Ex. 24 at 1:12-21 (S.B. 142 sponsor stating that a driving motivation for the Act was protecting minors from "pornography" on Instagram); *id.* Ex. 26 at 1:26-27 (S.B. 142 sponsor contending that government-compelled content classification is necessary because "unlike movies or video games" there is no voluntary private association like the MPAA or ESRB to age-rate online content); *id.* Ex. 5 (advocacy group founded by S.B. 142 co-drafter stating that the Act is needed to protect minors from "harm, abuse, and exploitation" through online communications).

These content-based justifications are indistinguishable from those that mandated strict scrutiny of Texas's materially indistinguishable app-store regulation. *See SEAT II*, 2025 WL 3731733, at *5 ("SB 2420 specifically sought to shield minors from certain speech the State deems objectionable or harmful … which is a content-based justification"); *CCIA II*, 2025 WL 3754045,

at *5 (same). Utah may not create a "new category of content-based regulation" for minors. *Brown*, 564 U.S. at 794. Like the Texas app-store law and other laws conditioning access to protected speech on parental consent, the Act is subject to strict scrutiny. *Id.* at 795 n.3 (video games); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1126 (D. Utah 2024) (social media); *Yost*, 778 F. Supp. 3d at 954–55 (same).

### 3.    The challenged provisions are content-based because of the Act's coverage definition.

Strict scrutiny also applies because the Act's content-based coverage definition means the challenged provisions' *application* necessarily burdens speech based on its content. The Texas app-store law was content-based for this additional reason based on similar coverage exemptions. *See SEAT II*, 2025 WL 3731733, at *5 (statute was content-based because it excluded non-profit apps providing access to emergency services, standardized tests, or college admissions support); *CCIA II*, 2025 WL 3754045, at *5 (same). Other cases finding speech regulations content-based due to similar coverage definitions include Judge Shelby's decision in *Reyes*, 748 F. Supp. 3d at 1121–24, and the decisions in *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1220–23 (N.D. Ga. 2025), *NetChoice, LLC v. Fitch*, 787 F. Supp. 3d 262, 274–77 (S.D. Miss. 2025), *Yost*, 778 F. Supp. 3d at 953–54, *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1Plaint4, 1186–91 (N.D. Cal. 2025), and *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *9–10 (W.D. Ark. Mar. 31, 2025).

Like the Texas app-store law in *SEAT II* and *CCIA II*, the Act's arbitrary, content-based exemptions—excluding apps that provide "direct access to emergency services" and which are operated "by or in partnership with" a government entity, nonprofit organization, or authorized emergency service provider, Utah. Code § 13-76-404(4)(a), (c), (d)—mean the challenged provisions' application "depend[s] entirely on the communicative content" a service provides. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). Plaintiffs face no barriers accessing the

14

American Red Cross Emergency app, but need parental approval to access the Salt Lake Tribune or Deseret News apps. Because the Act thus "defin[es] regulated speech by particular subject matter" and "singles out specific subject matter for differential treatment," *id.* at 163, 169, its every application is subject to strict scrutiny. *See also, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619–21 (2020) (plurality opinion) (law was content-based by virtue of its content-based coverage scheme).

### C.    The challenged provisions fail any level of First Amendment scrutiny.

"Strict scrutiny is unforgiving" and effectively "fatal" "absent truly extraordinary circumstances." *Free Speech Coal.*, 606 U.S. at 484–85. A law subject to strict scrutiny is presumptively invalid unless the government shows it is necessary to achieve a compelling interest and uses the least restrictive means. *See Playboy*, 529 U.S. at 813, 817. The challenged provisions fail this test as well as the intermediate scrutiny applicable to content-neutral regulations.

#### 1.    The challenged provisions are not necessary to directly and materially address any real, compelling interest.

While the State's purported interest in protecting minors may be compelling in general, the State "must present more than anecdote and supposition" to show the challenged provisions are necessary to *accomplish* that objective. *Playboy*, 529 U.S. at 822. The Act rests on no such evidence. *Cf.* Sieff Decl. Ex. 22 ¶¶ 10-44, 49 (expert report in similar case concluding that minors' access to app-based content is not linked to mental-health problems). Utah simply *assumes* that apps and downloaded content cause harm and *asserts* that censorship is the solution. That baseless "predictive judgment" is insufficient. *Brown*, 564 U.S. at 799–800 ("causal link" required).

Utah's lack of evidence is unsurprising. Apps benefit many young people, and there is no evidence of a causal link between app-distributed content and adverse effects in adolescents. *See* Sieff Decl. Exs. 10-11, 18-21. That is what Judge Pitman concluded with respect to the Texas app-

store law. *See SEAT II*, 2025 WL 3731733, at \*6 (finding no "evidence to substantiate the assertion that downloading an app of any kind without parental permission poses a health hazard to minors"); *CCIA II*, 2025 WL 3754045, at \*6 (same). And it is consistent with Plaintiffs' own experiences. *See* M.M. Decl. ¶ 18; N.G. Decl. ¶ 15; J.S. Decl. ¶ 15. In fact, as the Texas federal court found, *SEAT II*, 2025 WL 3731733, at \*6, preventing teens from accessing apps could *harm* them. *See* M.M. Decl. ¶¶ 18-19; N.G. Decl. ¶ 9, 15; J.S. Decl. ¶ 15; Sieff Decl. Ex. 22 ¶¶ 39-44.

Without evidence that the Act addresses any real harms, preventing teens from engaging with app content is not a legitimate government interest—no more than mandating early bedtimes, banning Percy Jackson novels, or limiting time spent listening to Taylor Swift albums. *See Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 701-02 (N.D. Ill. 2025) (First Amendment barred duty to design video games that are not "addictive"); *Courtright v. Epic Games, Inc.*, 795 F. Supp. 3d 1156, 1166 (W.D. Mo. 2025) (same).  Minors have a First Amendment right to access non-obscene speech. *Brown*, 564 U.S. at 794–95. "That the State finds expression too persuasive" or "catchy" for young people "does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 578; *see also Brown*, 564 U.S. at 798–99 (speech is no less protected because it is engaging). Nor does a concern that speech might be too distressing. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 185, 190–91 (2021) (profane criticism protected despite upsetting classmates); *Snyder v. Phelps*, 562 U.S. 443, 450–51, 458 (2011). These are decisions for families to make, not the government to mandate.

### 2.    The challenged provisions are not the least restrictive means, much less narrowly tailored.

Even were Utah to have evidence that minors' current family-moderated access to app stores poses real harms justifying government action, the State cannot show that age screening *everyone* in Utah and banning minors from accessing *any* app store content without individualized

parental consent is the "least restrictive" method to eliminate that harm. *Playboy*, 529 U.S. at 827.

Just as the Texas federal court held, *SEAT II*, 2025 WL 3731733, at *6; *CCIA II*, 2025 WL 3754045, at *6, Utah "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, (2) educating children and parents on the importance of using such tools, and (3) relying on existing criminal laws that prohibit related unlawful conduct." *Bonta*, 113 F.4th at 1121; *see also, e.g.*, *Reyes*, 748 F. Supp. 3d at 1127; *Fitch*, 787 F. Supp. 3d at 277–78; *Carr*, 789 F. Supp. 3d, at 1228–30; *Yost*, 778 F. Supp. 3d at 956; *Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575, 599–600 (W.D. Tex. 2025) ("*SEAT I*"); *Comp. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1036–37 (W.D. Tex. 2024) ("*CCIA I*"); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *6–8, *21 (W.D. Ark. Aug. 31, 2023). App stores and mobile devices allow parents to control the apps their children access. *See* Sieff Decl. Ex. 7 at ¶¶ 11, 29-36, Ex. 8 at ¶¶ 35-38; McMaster Decl. ¶ 4 (describing such controls). And Utah *already* bans minors from accessing content they are not constitutionally entitled to see. *See* Utah Code §§ 78B-3-1001, 78-B-3-1002. The existence of these less restrictive alternatives is fatal.

The challenged provisions are thus also inherently overinclusive and not narrowly tailored, since their only additive applications are to burden adults and to ban minors from accessing "fully protected" app store content. *Free Speech Coal.*, 606 U.S. at 482–87, 490–93 & 493 n.12; *see Brown*, 564 U.S. at 794–95. Indeed, the Act is significantly more overinclusive than the Utah law enjoined in *Reyes*—and those enjoined in *SEAT I, CCIA I, Fitch, Carr, Yost*, and *Griffin*—since it burdens and presumptively bans access to *any* app store content (apart from certain government-backed emergency apps), not just large social media apps. Restricting access to vast libraries of protected content because *some* apps may potentially contain *some* less-than-fully-protected

content "turns the First Amendment upside down." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002); *Reno*, 521 U.S. at 882. "Because it restricts almost all apps and content within apps," the Act "does not employ 'the least restrictive means' to stop minors from accessing harmful material" the State is permitted to restrict. *SEAT II*, 2025 WL 3731733, at *6.

It is no answer that the Act is "narrowly tailored" to aid parents. *Brown* rejected the argument that it "is a proper governmental means of aiding parental authority" to "punish[] third parties for conveying protected speech to children *just in case* their parents disapprove of that speech." 564 U.S. at 802. And that interest is especially inapt here, as the Act not only overrides parents by making the State's choices the default, *id.*, but also fails to give even willing parents the option to give blanket consent so that their children can have the latitude to download apps of their choice. *See* Utah Code § 13-76-201(1)(b). Some parents would permit their children to access any apps they are eligible to download. Others (like M.M.'s) would prefer to make their own decision about when their children are mature enough to download apps freely. McMaster Decl. ¶¶ 5, 7-9. And still other parents (also like M.M.'s) would prefer a mixed approach, where they approve some apps but allow unrestricted blanket access to books, films, music, podcasts, and other content within apps already downloaded, empowering those children to make responsible decisions about what is appropriate for them. *Id.* ¶¶ 4-5. Existing parental controls offer these options; the Act does not. Forcing parents to surveil their children and provide repeated consent on the State's terms abridges the "rights of young people" to access content their parents deem "harmless," *Brown*, 564 U.S. at 805, and undermines parents' ability to manage their households as they see fit, McMaster Decl. ¶¶ 5-6, 10-11.

### 3.     The challenged provisions are also substantially underinclusive.

The Act's underinclusivity is also "alone enough to defeat it." *Brown*, 564 U.S. at 802. A law that professes to serve broad goals like preventing harm to minors, and yet regulates only a

fraction of the harm's potential causes, "raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Id.* (citing cases).

As in *Brown*, the Act here focuses on a small subset of media—non-native mobile apps disseminated through app stores, and paid content within apps—but excludes native apps, free content within apps, paid content available online but not in mobile apps, content within apps that do not require sign-in, and content available via physical media; and arbitrarily exempts services that primarily provide access to educational content or emergency services. Utah Code § 13-76-404(4)(a), (c), (d). Texas's materially identical app-store law was accordingly underinclusive because teens could use pre-downloaded browser apps like Safari to access the same content. *See SEAT II*, 2025 WL 3731733, at *7; *CCIA II*, 2025 WL 3754045, at *7 (same). Similar defects were fatal to Utah's earlier attempt to regulate social media applications in *Reyes*, 748 F. Supp. 3d at 1128 (law fatally underinclusive because it "preserves minors' ability to spend as much time as they want on social media platforms" and merely disabled their access to certain content and features), and Texas's attempt to do so in *SEAT I*, 765 F. Supp. 3d at 597 (law underinclusive because "[a] teenager can read Peter Singer advocate for physician-assisted suicide in Practical Ethics on Google Books but cannot watch his lectures on YouTube or potentially even review the same book on Goodreads"). The Act fails for this reason, too.

### 4. The challenged provisions fail even intermediate scrutiny.

A speech restriction can survive intermediate scrutiny only if the government proves the law (1) serves a "real" and "not merely conjectural" government interest "unrelated to the suppression of free expression," and (2) "will in fact" serve that interest in "a direct and material way" (3) that is narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662–64 (1994) (citation omitted). The challenged provisions fail this test too.

*No evidence the challenged provisions achieve a state interest.* The State has no evidence that the Act advances its purported goal of protecting minors from harmful content on the internet.

*First*, the legislative record lacks evidence establishing that unmitigated access to libraries of protected content presents a real problem, much less that the Act's parental-consent regime for most—but not all—non-native apps actually addresses that or any problem directly. "[M]ere conjecture" positing the existence of a problem is not "adequate to carry a First Amendment burden[,]" and the State may not restrict speech because it *might* prevent *some* "anticipated harm." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 307 (2022) (citations and quotation marks omitted).

*Second*, nothing in the record shows the Act will help adolescents' wellbeing. *See Edenfield v. Fane*, 507 U.S. 761, 771–72 (1993) (intermediate scrutiny requires direct evidence of advancing the government's interest). The state must show that the Act will "alleviate[] in a direct and material way a real, non-speculative harm." *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021) (holding that city ordinance regulating speech activity near roadways failed intermediate scrutiny). That showing requires concrete evidence; reliance on "scattered and factually inapposite anecdotes," theoretical expert opinions, and exhortations to "common sense" are not enough. *Id.* at 1245. In fact, M.M.'s testimony and scientific evidence show that restricting teens' access to apps and paid content will, for many, cause harm. *Supra* §§ I.C.1. And in any case, the Act arbitrarily exempts similar or even identical media depending on whether an app is native to a device or not. That is fatal. A law cannot advance a state's interests under intermediate scrutiny if it "undermine[s] and counteract[s]" its goals, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995), or "is so pierced by exemptions and inconsistencies" that it permits the very evils it purports to prevent, *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 190 (1999).

*Third*, the Act fails intermediate scrutiny regardless because "correct[ing] the mix" of fully

protected speech teens may access is "related to the suppression of free expression" and an impermissible basis to restrict speech under any standard. *Moody*, 603 U.S. at 740.

**No evidence of narrow tailoring.** Even a substantial government interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 597 (2021) (quotation omitted). The Act violates that rule, indiscriminately restricting access to *all information* published through app stores, including fully protected speech. There is no reason that "alternative measures that burden substantially less speech," like voluntary parental controls or existing Utah law—which already bans minors from content obscene to them—"would fail to achieve the government's interest[]" in protecting minors from unlawful material. *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1074 (10th Cir. 2020) (ordinance restricting speech within road medians failed intermediate scrutiny) (quotation omitted). In short, Utah was required to show the inadequacy of "less-burdensome alternatives." *See Brewer*, 18 F.4th at 1255. It has not.

### D.    The Act's "material change" provision is unconstitutionally vague.

The Act's mandate that app stores revoke minors' access to an application whenever it makes a change to its terms of service that "materially changes" the App's "functionality" or "user experience," Utah Code § 13-76-101(18)(d), is independently invalid because it is unconstitutionally vague. A law is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Vague laws regulating speech face an even more stringent test because their "uncertain meanings" lead regulated persons "to 'steer far wider of the unlawful zone'" by over-censoring. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (citation omitted); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010). Regulations of speech must thus be precise, *NAACP v. Button*, 371 U.S.

415, 433, 438 (1963), including when "aimed at protecting children from allegedly harmful expression." *Interstate Cir.*, 390 U.S. at 689 (citation and quotation marks omitted).

The material change provision fails this test just as the Texas federal court held with respect to the nearly identical material change provision in Texas's app-store law. *See SEAT II*, 2025 WL 3731733, at *8; *CCIA II*, 2025 WL 3754045, at *8. As with that law, the Act does not define what changes are "material," nor what aspects of an app relate to its "functionality" or "user experience." Utah Code § 13-76-101(18)(d). *See also, e.g.*, *Bonta*, 770 F. Supp. 3d at 1204–07 (phrase "materially detrimental" in online speech regulation was unconstitutionally vague). When Spotify added podcasts alongside music, was that a material change? What about when the New York Times app adds a new puzzle game? Changes its home screen? The standard is subjective, meaning app stores will predictably and broadly revoke access to avoid liability.[3] *See Counterman v. Colorado*, 600 U.S. 66, 77–78 (2023) (citing *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). And given the volume of routine app updates—reorganizing menus, adding content, or modifying layouts—users will frequently lose parent-approved access.

### E.    The Act's challenged provisions are facially invalid.

Facial relief is the proper remedy here. *See SEAT II*, 2025 WL 3731733, at *9 (holding virtually identical Texas statute facially invalid under the First Amendment); *CCIA II*, 2025 WL 3754045, at *9 (same). A regulation is facially invalid under the First Amendment if "a substantial number of [its] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation & quotation marks omitted). This is a two-step analysis.

First, courts determine a challenged law's "full range of applications" (i.e., does it regulate

---

[3] Even assuming the question were whether parents would consider a "change" "material," app stores cannot reasonably guess what any given parent would think for any given child. *See Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012) (law vague when avoiding liability turned on predicting third-party reactions to particular speech).

speech in some, most, or all cases). *Id.* at 726. Here, *every* application burdens the "right to access speech" by placing app stores' content libraries behind an age-gate. *Free Speech Coal.*, 606 U.S. at 495; *see, e.g.*, *Bonta*, 770 F. Supp. 3d at 1201–03 (age-verification provision facially invalid).

Second, courts decide which applications to speech "violate the First Amendment," comparing the constitutional and unconstitutional applications. *Moody*, 603 U.S. at 725–26. When the pertinent facts "are the same across the board" and the substantial effect of a law is to regulate speech without constitutional justification, the law is overbroad and facially invalid. *Ams. for Prosperity*, 594 U.S. at 618–19.

The analysis above, *supra* §§ I.A-D, demonstrates that *every* application of these challenged provisions to protected speech is unconstitutional. App stores provide access to "a wide array of protected First Amendment activity," *Packingham v. N. Carolina*, 582 U.S. 98, 105 (2017), "only a small portion of which falls outside First Amendment coverage," *SEAT II*, 2025 WL 3731733, at *9; *see Brown*, 564 U.S. at 790–91 (unprotected speech is "narrowly limited"). The challenged provisions' facial validity thus boils down to a comparison between their substantial regulation of protected speech (none of which the State can show is constitutional) versus their catch-as-catch-can regulation of *unprotected speech* or *non-speech* purchases the provisions may incidentally reach. And even many of those incidental constitutional applications are irrelevant since Utah law *already* restricts online content that is unprotected under the First Amendment for minors. *See City of L.A. v. Patel*, 576 U.S. 409, 418 (2015) (facial challenges concern applications that are not already legitimately authorized by other laws); *United States v. Sup. Ct. of New Mexico*, 839 F.3d 888, 917 (10th Cir. 2016) (same).

Prophylactic, blanket regulations of speech just to shield minors from potential exposure to unprotected speech present the archetype of overbroad legislation that turns the First

Amendment on its head. *Ashcroft*, 535 U.S. at 255; *see also Butler v. Michigan*, 352 U.S. 380, 383 (1957); *Reno*, 521 U.S. at 882.

## II. The Remaining Factors Favor A Preliminary Injunction.

The remaining preliminary injunction factors are also satisfied.

*First*, Plaintiffs will suffer irreparable harm absent relief. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also ACLU*, 194 F.3d at 1163 (restricting protected speech constitutes irreparable injury). This irreparable harm manifests not just in the general loss of Plaintiffs' rights, but in the concrete loss of opportunities for Plaintiffs to participate in current debates and access or share useful information in real time, and in the damage the Act's government-imposed surveillance regime does to families built on relationships of trust. *See* M.M. Decl. ¶¶ 12-16, 18-19; N.G. Decl. ¶¶ 7-10, 12-16; J.S. Decl. ¶¶ 8-11, 13-16; McMaster Decl. ¶¶ 5, 9-11. Money damages—which may not even be recoverable if the State asserts sovereign immunity, *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010)—cannot compensate these incalculable losses.

*Second*, the equities and public interest support an injunction. These factors "merge" because the government is the defendant, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and support an injunction where "a constitutional right hangs in the balance." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) (the infringement of constitutional rights, even temporarily, "trumps any harm" to the government). The Tenth Circuit has repeatedly affirmed that the unjustified restriction of First Amendment freedoms "outweighs whatever damage [a] preliminary injunction may cause" by preventing the government from "enforc[ing] what appears to be an unconstitutional statute." *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (injunction was in the public interest because "it will protect the free expression of the

millions of Internet users"); *see also Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (same). Those equities are heightened here, since the Act not only censors fully protected speech, but invades parents' authority (McMaster Decl. ¶¶ 7-11) over "the care, custody, and control of their children" that constitutes "perhaps the oldest of the fundamental liberty interests recognized" by our legal and political tradition. *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

## III.    The Court Should Not Require A Bond.

The Court has discretion to enter an injunction without requiring a bond where "fundamental constitutional rights" are at stake, *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1294 (D. Utah 2023) (citation & quotation marks omitted); *see* 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2954 (3d ed.). The Court should not require one here.

## CONCLUSION

Plaintiffs M.M., N.G., and J.S. request an order enjoining Utah Code §§ 13-76-201(1)(a)-(e), 13-76-202(1)-(3), 13-76-301, 13-76-401, and 13-76-402 on their face or, at a minimum, awarding any facial or as-applied injunctive relief the Court deems appropriate.

Additionally, because the Act's unconstitutional age-verification, parent-identification, and parental-consent mandates are integral to the Act, no other provisions could operate without them. The entire Act—and not just the challenged provisions—accordingly requires invalidation. *See Vega v. Jordan Valley Med. Ctr., LP*, 449 P.3d 31, 35 (Utah 2019) (provisions not severable when they "cannot stand alone or serve a purpose without" the invalidated provisions).

Respectfully submitted this 11th day of February 2026.

PARR BROWN GEE & LOVELESS

/s/   David C. Reymann
    David C. Reymann

*Attorney for Plaintiffs*

25